Sondra A. "Sandy" GARDNER and Charles R. Ferrara, formerly d/b/a E.R.A. New Haven Real Estate of Clay–Platte County, Inc., a/k/a ERA New Haven Real Estate, Respondents.

v.

Mel BLAHNIK, Appellant.

No. WD 44999.

Missouri Court of Appeals, Western District.

May 26, 1992.

Keith W. Hicklin, Witt & Hicklin, P.C., Platte City, for appellant.

John H. Fairfield, Moore, Cady & Fairfield, Platte City, for respondents.

Before LOWENSTEIN, P.J., and SHANGLER and SMART, JJ.

SMART, Judge.

Mel Blahnik appeals from the judgment entered following the jury verdict awarding Sondra Gardner and Charles Ferrara, respondents, $7,497.50 together with $1,552.92 interest for a commission resulting from the sale of real estate pursuant to a written listing agreement. Appellant argues that the trial court erred in overruling his motion for directed verdict and motion for judgment notwithstanding the verdict because (I) respondents did not have standing to bring this action and (II) that the trial court erred in denying appellant's motion for directed verdict.

Mel Blahnik is a home builder. On October 24, 1988, Mr. Blahnik entered into an Exclusive Listing Agreement with ERA New Haven, for the sale of a home which Mr. Blahnik was constructing. ERA New Haven (ERA) was represented by Sondra Gardner, a licensed real estate agent. While Mr. Blahnik and Ms. Gardner discussed the agreement, appellant was instructed to make a list of any prospective purchasers who should be excluded from the terms of the agreement. Mr. Blahnik failed to specify any names, and signed the agreement without any exclusions. Ms. Gardner signed in behalf of the broker,

who was designated only as "ERA New Haven." The agreement provided for a 60 day exclusive listing period which had an ending date of December 24, 1988. The respondents were entitled to a commission if the property was sold before this ending date, or within 180 days after the listing's ending date if sold to someone to whom respondents had "submitted" the property during the exclusive listing period.

Mr. Blahnik sold the property to James and Gloria Booker. The closing occurred on January 24, 1989, exactly thirty days after the exclusive listing period ended and within the extension period. Although no one associated with respondents showed the Bookers the property, Linda Chenault, an agent for ERA New Haven, testified that she spoke with Mrs. Booker on the phone during the exclusive listing period. Ms. Chenault testified that Mrs. Booker indicated she had seen an ERA advertisement concerning the house in a magazine. Ms. Chenault answered many questions about the house including the name of the builder, Mr. Blahnik. She also set up an appointment with Mrs. Booker to show the Bookers the property. Mr. and Mrs. Booker did not, however, show up for the appointment. Ms. Chenault tried several times to contact the Bookers after the appointment date, and left messages with a child at the Bookers residence, but was unable to reach them. This is the only alleged contact between the buyers and respondents' real estate business.

### WHETHER THE PROPERTY WAS "SUBMITTED"

■ The jury found that the property was "submitted" to the buyers by ERA within the exclusive listing period and was then sold to the Bookers within the 180 day extension period, thereby entitling respondents to their commission. Mr. Blahnik contends on appeal that there was no legal and substantial evidence that respondents "submitted" the listed property to the buyers within the meaning of the listing agreement. In determining the meaning of the term "submitted" as used in the listing agreement, the court seeks to ascertain the intention of the parties in the light of the circumstances and purposes of the agreement. Once the parameters of the legal meaning of this term are determined, the court can review the evidence to resolve whether the evidence could support the jury's finding.

The listing agreement in this case includes the following provisions:

4. The owner agrees to pay the Broker a fee of 5% of the purchase price when the Broker produces a purchaser ready, willing and able to purchase said property at the price and on the terms stated, or later agreed upon, or when a sale, exchange or lease of said property be made by owner or any other person during the term of this exclusive right to sell.

\* \* \*

8. Should a sale be made directly or indirectly within 180 days after this exclusive right to sell terminates, to parties with whom said Broker had submitted subject property to [sic] during the term hereof, and said Broker notifies owner in writing of said party during this term, the owner agrees to pay aforesaid fee to the Broker.

In *Nichols v. Pendley*, 331 S.W.2d 673 (Mo.App.1960), a broker brought a claim for commission based upon a listing agreement which extended only for a period of two weeks. That contract also, however, had a "tail" provision somewhat like the one in this case:

If this property is sold during the time this agreement is in force, or if sold to anyone to whom said property was submitted by the Nichols Agency or his representatives within 3 months from the termination date hereof, then in that event the undersigned shall pay to said Nichols Agency, Broker, 5% of the sales price as his commission due.

In that case, a salesman of the broker showed the property to Mr. and Mrs. Woolever within the two week listing period. The broker heard nothing further from the Woolevers until the property was transferred (in an exchange) to the Woolevers within the ninety day extension period.

The Court in *Nichols*, discussing plaintiff's claim to a commission, stated that if the broker's claim had been based on *quantum meruit* rather than an express contract, the applicable question would be whether the broker was the "efficient procuring cause" of the sale. But in that case, as this one, the suit was one on express contract, and the question was whether the property had been "submitted" to the persons ultimately buying the property. In answering that question, the court looked to the fact that one purpose of the "tail" provision is to keep the broker actively searching for prospective buyers and "on the job, even to the last minute of the term of his employment," even though any proposed sale agreement might not be entered into within the exclusive period. 331 S.W.2d at 677.

The court also looked to the common definitions of the word "submit" ("to leave or commit to the discretion of another" [1] and "to offer" [2] and the legal use of the word ("to present for determination; to commit to the discretion or judgment of another").[3] Taking the purpose of the contract into account, and the usage of the word, the court in *Nichols* found that the broker had "submitted" the property when he "offered defendants' property to the Woolevers for sale and took them through the house." *Ibid.*

It would seem that to "submit" a proposition is essentially to bring it to the attention of another, as by advertising or by introduction, with the intent that it be accepted. As the court in *Nichols* indicated, the act of *submitting* a proposition is far less than the act of *negotiating* concerning a proposition.

> One *submits* a proposition. Thereafter the other may "consider" it, and the parties may *negotiate* concerning it to a conclusion. *Ibid.* (emphasis in original)

Appellant argues that the jury could not have reasonably found that ERA or its agent "submitted" the property to Mr. and Mrs. Booker in this case because the *Nichols* case stands for the proposition that the house *must be physically shown* to the prospective buyers before it can be considered to have been "submitted" to them. Appellant points out that the realty company never physically showed the house to the Bookers in this case.

■ In the opinion of this court, *Nichols* does not require such a determination. *Nichols* holds that the physical showing of the house did qualify as a submission of the property. However, neither *Nichols* nor any other case brought to the attention of this court holds that the property *must be physically shown* to the prospective purchaser before it can be considered to have been submitted. Consequently, the issue is whether there was evidence from which the jury could reasonably find that the property was "offered" to the Bookers and "committed to the discretion of" the Bookers by the realty company.

This court's function on appeal is not to weigh the evidence presented at trial, but instead, it must determine whether there was sufficient evidence presented to support the verdict. *Marshall v. Edlin*, 690 S.W.2d 477, 479 (Mo.App.1985). In doing so, the evidence is viewed in the light most favorable to plaintiff and plaintiff shall have the benefit of all reasonable inferences that could be drawn from the evidence. *Id.* Additionally, defendant's evidence (the testimony of Mrs. Booker and of Mr. Blahnik) should be disregarded except as it tends to support the jury's verdict. *Id.*

In this case, there was testimony from Linda Chenault, an ERA agent, that Mrs. Booker called the realty office to inquire about the Blahnik property after Ms. Gardner had listed and advertised the property. Ms. Chenault testified that she had a lengthy discussion with Mrs. Booker concerning the property. Ms. Chenault testified that Mrs. Booker told her that she and her husband were very interested in the property and had learned about it from an

1. *Webster's New International Dictionary*, Second Edition.

2. Roget's International Thesaurus (763.2).

3. 83 C.J.S., p. 571; Black's Law Dictionary, Fourth Edition.

advertisement published by ERA. Ms. Chenault conveyed information about the house to Mrs. Booker, including such items as number of bedrooms, bathrooms, and lot size. In response to Mrs. Booker's questions, she told her that Mr. Blahnik was the builder of the home. Ms. Chenault also set up an appointment with the Bookers to show them the property. The Bookers, however, failed to appear for their appointment. She tried to contact the Bookers several times thereafter by leaving messages at their home with a child. The Bookers never returned these messages.

Ms. Gardner, the listing agent, testified that she was contacted by Mr. Blahnik on November 20, 1988, during the exclusive listing period, at which time he informed her that the Bookers were very interested in buying the property. Mr. Blahnik expressed to Ms. Gardner that he knew he needed to direct this couple to her and asked her if she would meet with them the following morning on November 21, 1988, to write up an offer and consider some type of a trade on their property. Mr. Blahnik called Ms. Gardner the following morning and canceled the appointment, saying that the Bookers were most likely not going to follow through on the deal. Ms. Gardner then received a third call from Mr. Blahnik on November 22, 1988, where he informed her that he was going to go ahead and sell the property to the Bookers. He asked Ms. Gardner if he could make "some kind of deal" where he would offer ERA the listing on the Booker's property in lieu of a commission on this transaction so that he could go ahead and sell the property to them without incurring a commission. After checking with Mr. Ferrara, Ms. Gardner told Mr. Blahnik that a trade of listings as he proposed would not be possible. Ms. Gardner heard nothing further from Mr. Blahnik, but the evidence shows that Mr. Blahnik and the Bookers went ahead with their negotiations and excluded the broker.

In view of the foregoing, the jury could reasonably have found that ERA's advertising of the home, and Ms. Chenault's communications with the Bookers, and her efforts to show them the property, amounted to a "submission" of the property to them. The trial court did not err in denying appellant's motion for directed verdict.

## THE PROPER PARTIES PLAINTIFF

Next the court turns to the issue of the proper parties to bring the action. Mr. Blahnik contends that the evidence shows that ERA New Haven Real Estate of Clay–Platte County, Inc., a corporation, was the obligee in the contract at issue, rather than plaintiff Ferrara. He contends that the plaintiffs had no standing to bring the action since they were not parties to the contract.

◼ Respondents contend that appellants waived their right to raise the issue of whether respondents could bring this action in their individual capacity based on Missouri Supreme Court Rule 55.13, which states that a party must "aver the ultimate fact of the capacity of a party to sue or be sued or the authority of a party to sue or be sued in a representative capacity ... by specific negative averment." However, respondents argument fails for two reasons. First, respondents confuse the issue of capacity to sue with standing to sue. The issue of whether a plaintiff has standing to sue is not related to one's legal capacity to sue, which is waived unless timely asserted. *Pace Const. Co. v. Mo. Hwy. & Transp. Com'n,* 759 S.W.2d 272, 274 (Mo. App.1988). The capacity of a party to sue means the party has the right to avail himself access to the courts because he is without any general disability (e.g., infancy or insanity). *Earls v. King,* 785 S.W.2d 741, 743 (Mo.App.1990). Standing to sue, on the other hand, exists when a party has an interest in the subject matter of the suit which gives that person a right to recovery, if validated. *Id.* This court has the unquestioned authority to entertain a standing issue, for this issue cannot be waived. *Pace Const. Co.,* 759 S.W.2d at 274.

◼ The second reason respondents' argument fails is because Rule 41.01(b) provides that "[c]ivil actions originating before an associate circuit judge ... shall be governed by Rules 41 through 101, except that Rule 55 shall not apply unless the court

orders the application of Rule 55, or specified portions of it." *See also Hall v. Superior Chemicals & Fertilizer, Inc.*, 819 S.W.2d 422 (Mo.App.1991). Therefore, the rule respondents rely on, Rule 55.13, is not applicable to this action because this action arose in associate circuit court. *Id.*

Since appellant's attack on the plaintiffs' standing is not resolved by Rule 55.13, the court must examine the standing issue raised by appellant. In deciding the issue of whether respondents had standing to initiate this action, this court must determine whether respondents had an interest in the subject matter of the lawsuit, thereby giving them a right to relief. *Earls,* 785 S.W.2d at 743. This court reviews the record by examining the evidence, and any reasonable inferences drawn from the evidence, in the light most favorable to respondent. *Marshall v. Edlin,* 690 S.W.2d 477, 479 (Mo.App.1985).

■ This action is brought by Sondra Gardner, a licensed real estate agent, and Charles Ferrara, a licensed broker. Ms. Gardner was the agent listing the property. She advertised the property, and paid for the advertising and other expenses out of her own pocket. She was to receive a specific percentage (seventy percent) of the commission. Ms. Gardner clearly had sufficient financial interest to be a party plaintiff, although she was not the named obligee on the listing contract. Indeed, she stood to gain or lose by direct operation of the judgment to be rendered in the case. *See Bunting v. McDonnell Aircraft Corp.,* 522 S.W.2d 161, 169 (Mo banc 1975); 59 Am.Jur.2d *Parties* §§ 30, 31 (1987).

■ The style of the case refers to Ferrara as "formerly d/b/a E.R.A. New Haven Real Estate of Clay–Platte County, Inc., a/k/a ERA New Haven Real Estate." The style of the case therefore implies that Ferrara used a corporate name as a d/b/a, and also used "ERA New Haven Real Estate" as a d/b/a. The text of the petition then refers to Mr. Ferrara as the· "owner/broker" of the corporation. The petition is thus somewhat contradictory and confusing as to the involvement of the corporation.

The evidence at trial shows neither Mr. Ferrara nor Ms. Gardner had a good understanding of issues related to the separate identities of the proprietorship and the corporation. Mr. Ferrara testified that at the time the listing agreement was executed, his company, "ERA New Haven," was in transition from a sole proprietorship, in which Mr. Ferrara held sole ownership interest, to a corporation. Mr. Ferrara testified he was "unclear" on whether, at the time the listing agreement was signed, Ms. Gardner was acting in behalf of the sole proprietorship or the corporation. He testified that at the time of the signing of the listing agreement there were no "assets or anything moved into the corporation." Ms. Gardner indicated in her testimony her belief that she was acting for the corporation. Mr. Ferrara, when asked whether "ERA New Haven" was the same thing as the corporation, rather inanely responded, "sounds good to me." He then stated, "I'll leave it to the attorneys to split hairs on who is what. I don't really know exactly." Unfortunately, no one ever got around to splitting hairs on "who is what."

Possibly, by the time of trial, the corporation charter had been forfeited. If this contract had ever been assigned to the corporation, Mr. Ferrara could have been acting as a statutory trustee under Section 351.525 RSMo.1986. However, there was no allegation that Mr. Ferrara was acting as a statutory trustee. The listing agreement indicates that the entity on the contract is "ERA New Haven." "ERA New Haven" was the "doing business" name of Mr. Ferrara and was apparently also the "doing business" name of the corporation. The evidence concerning the relationship of the proprietorship and the corporation was very confusing and conflicting. Nevertheless, the testimony established that Ferrara was the broker in the transaction, and that he was the "owner" of "ERA New Haven." Viewing the evidence in the light most favorable to the verdict, the court finds that there was evidence supporting Ferrara's right, as well as Gardner's right, to press the claim for the commission.

Although Gardner and Ferrara had standing to maintain the action, some of the evidence indicated that the corporation may have been the party entering into the contract. Therefore, the corporation must be deemed a necessary party under Rule 52.04(a). Otherwise, Blahnik may be subjected to a risk of double liability if a later action is brought for the commission by the corporation. Unless the corporation is a licensed real estate broker, the corporation cannot bring an action. See *Moore v. Prindable*, 815 S.W.2d 25 (Mo.App.1991). Section 339.160 RSMo.1978. Nevertheless, regardless of whether the corporation is a licensed broker, it can still be joined as a party. In this case, the record does not show whether the corporation was a broker. Nor does the record show whether the corporation is presently in good standing. In any event, as far as is shown by the record, there is nothing to prevent the corporation from bringing an action for the commission next week. In view of the risk of double liability, the corporation must be joined to the action.

The judgment is reversed, and the case is remanded to the trial court with instructions that the corporation must be joined as a party. If the corporation does not join as a plaintiff, it should be joined as an additional party defendant so that it will be bound by any judgment. If the corporation is not in good standing, the statutory trustees must be joined. If plaintiff fails to join the corporation or the statutory trustees, as the case may be, the trial court must decide whether the corporation is an indispensable party and thus whether the case should be dismissed in accordance with Rule 52.04(b). *See Vanderson v. Vanderson*, 668 S.W.2d 167 (Mo.App.1984); *Bunker R–III School District v. Hodge*, 666 S.W.2d 20 (Mo.App.1984), appeal after remand, 709 S.W.2d 884 (Mo.App.1986).

Then, if the case is allowed to proceed, the case should be retried. The court regrets having to order a new trial, but concludes that it is necessary in the circumstances of the case.

The judgment is reversed and the case is remanded for action consistent with the instructions in this opinion.

All concur.