**LAKE ARROWHEAD PROPERTY OWNERS ASSOCIATION,
Respondent,**

v.

**Dona BAGWELL and Ron
Cutting, Appellants.**

**No. WD 61370.**

Missouri Court of Appeals,
Western District.

Feb. 25, 2003.

Motion for Rehearing and/or Transfer to
Supreme Court Denied April 1, 2003.

Keith E. Witten, Kansas City, MO, for appellants.

Steven D. Wolcott, Liberty, MO, for respondent.

Before THOMAS H. NEWTON, P.J., ROBERT G. ULRICH and EDWIN H. SMITH, JJ.

THOMAS H. NEWTON, P.J.

This is an appeal from a judgment rendered in favor of Lake Arrowhead Property Owners Association (the Association) who sought to enforce restrictive covenants against Ms. Dona Bagwell and Mr. Ron Cutting, alleged non-compliant property owners. There is insufficient evidence to determine that the required quorum was present at the Association meetings to consider amendments to the restrictive covenants that were passed. We reverse and remand for further evidentiary proceedings on that issue.

## I. FACTUAL AND PROCEDURAL BACKGROUND

The Association is an unincorporated association whose members own property in the Lake Arrowhead subdivision of Clinton County. The subdivision includes some 2068 lots. Over the years, the Association has adopted various amendments to restrictive covenants governing property use within the subdivision. Appellants, Dona Bagwell and Ron Cutting, own property within the subdivision. When they failed to comply with the Association's restrictive covenants governing their property use, the Association filed a petition for declaratory judgment and injunctive relief to compel their compliance. The trial court rendered judgment for the Association, ordering appellants to comply with the covenants.

The Association's action centers on three amendments to the restrictive covenants approved by lot owners at annual meetings held in 1993,[1] 1996,[2] and 1998.[3] The minutes from these meetings do not record how many people attended each of the meetings. In some cases, the minutes do record the number of votes cast for and against the contested amendments. The minutes from the 1993 meeting do not record the number of votes cast for and against the contested amendment approved at that meeting, but they do record a vote of 142 for and 25 against a different amendment approved at that meeting. The minutes from the 1996 annual meeting record 88 votes for and 9 votes against the contested amendment approved at that meeting. The minutes from the 1998 annual meeting record 96 votes for and 11 votes against the contested amendment approved at that meeting.

Appellants raise three points on appeal. In their first point, appellants argue that the Association lacks the capacity to maintain this action in its own name because it is unincorporated and, therefore, unable to sue or be sued. In their second point, appellants argue that the Association has not shown that the contested amendments were adopted in accordance with the Association's own quorum requirements. In their third point, appellants argue that the trial court's judgment is against the weight of the evidence because the evidence ad-duced at trial shows that "the largest number of votes recorded at any meeting at which the amendments were purportedly adopted was far less than a quorum."

## II. STANDARD OF REVIEW

When reviewing a declaratory judgment, we apply the same standard of review as in any other court-tried case. *Guyer v. City of Kirkwood*, 38 S.W.3d 412, 413 (Mo. banc 2001). Accordingly, we will affirm the trial court's judgment unless there is no substantial evidence to support it, unless it is against the weight of the evidence, unless it erroneously declares the law, or unless it erroneously applies the law. *Murphy v. Carron*, 536 S.W.2d 30, 32 (Mo. banc 1976).

## III. LEGAL ANALYSIS

### A. The Association Has Capacity to Enforce the Restrictive Covenants

#### 1. Background

■■■ At common law in Missouri, an unincorporated association lacked legal capacity[4] because it "possessed no status apart from the persons comprising it and was not an entity." *State ex rel. Auto. Club Inter–Ins. Exch. v. Gaertner*, 636 S.W.2d 68, 70 (Mo. banc 1982). Absent specific statutory authority, such an association could not sue or be sued in its common or associate name. *Id.*

1. The 1993 amendment regulates the age of mobile homes allowed within the subdivision.

2. The 1996 amendment designates certain conditions as nuisances and allows the board of trustees to act against such nuisances.

3. The 1998 amendment regulates the placement of single-wide mobile homes within the subdivision after May 12, 1998.

4. Although the Association directs our attention to case law pertaining to standing, appellants have not questioned the Association's standing. As our decisions have noted, the issue of capacity is not related to the issue of standing. *Gardner v. Blahnik*, 832 S.W.2d 919, 923 (Mo.App. W.D.1992). "The capacity of a party to sue means the party has the right to avail himself access to the courts because he is without any general disability (e.g., infancy or insanity)." *Id.* "Standing to sue, on the other hand, exists when a party has an interest in the subject matter of the suit which gives that [party] a right to recovery, if validated." *Id.* The point before us relates solely to Lake Arrowhead's capacity to sue.

Rule 52.10[5] has since removed that disability, allowing an unincorporated association to sue by designating certain members as representative parties in the action. In pertinent part, it says:

An action brought by ... the members of an unincorporated association as a class *by naming certain members as representative parties* may be maintained only if it appears that the representative parties will fairly and adequately protect the interests of the association and its members.

*Id.* (emphasis added).

■ Rule 52.10 exists "to give an aggregate of persons, already bound together by jural relations, but otherwise without capacity to sue or be sued, jural 'entity treatment' as a class for that purpose." *State ex inf. Ashcroft v. Kansas City Firefighters Local No. 42,* 672 S.W.2d 99, 123 (Mo.App. W.D.1984). *See also Firefighters Local No. 77 v. City of St. Joseph,* 822 S.W.2d 866, 870 (Mo.App. W.D.1991) ("Rule 52.10 treats the unincorporated association as a class to give entity treatment to the association when for formal reasons it cannot sue or be sued as a jural person.").

■ Although Rule 52.10 generally allows an unincorporated association to obtain "entity treatment," the Association's action in this case does not appear to comply with Rule 52.10. The Association sued solely as an unincorporated association without "naming certain members as representative parties," under Rule 52.10. *See State ex rel. Missouri State High Sch. Activities Ass'n v. Ruddy,* 643 S.W.2d 596, 598 (Mo. banc 1983) (under Rule 52.10, "[t]he proper way in which to sue and obtain service upon a voluntary unincorporated association is by means of a class

action, in which some members are designated to represent all members of the association."). *See also* 15 Missouri Practice, Civil Rules Practice, § 52.10–2 (2nd ed. 1997) ("The requirements of the rule are simple. In authorizing the Court to treat an action by and against unincorporated associations as a class action, the Rule provides that the action be identified by naming some members of the association as representative parties."). The lawsuit did not, for example, designate any of the Association's trustees as representative parties.

This discussion is not determinative of this point, because we conclude that the very nature of the Association's restrictive covenants obviates the need to rely upon Rule 52.10 here.

**2. The Restrictive Covenants Confer Upon the Association the Right to Enforce the Covenants Against Noncompliant Members.**

The restrictive covenants at stake in this case represent a private contractual obligation. *Kauffman v. Roling,* 851 S.W.2d 789, 792 (Mo.App. W.D.1993). *See also Brentmoor Place Residents Ass'n v. Warren,* 816 S.W.2d 7, 11 (Mo.App. E.D.1991) (restrictive covenant prohibiting installation of any structure in subdivision without incorporated homeowners' association's approval could not be deemed state and local zoning or other state and local government regulation because it was a private contractual agreement).

As the Eastern District explained in *Maryland Estates Homeowners' Ass'n v. Puckett:*

The Indenture of Trust and Restrictions is a contract to which each homeowner becomes a party when acquiring proper-

---

**5.** All rule references are to the Missouri Supreme Court Rules of Civil Procedure (2002) unless otherwise indicated.

ty in the subdivision.... By acquiring the property, the owners agree to the terms of the restrictive covenants contained in the Indenture. It is agreed by the parties that persons residing in property in the subdivision are equally bound.

936 S.W.2d 218, 219 (Mo.App. E.D.1996).[6]

■ "Membership in the association is mandatory upon purchase of the lot, and with membership comes dues, assessments and restrictions on the use of the lot contained in the association's declaration." *Chesus v. Watts*, 967 S.W.2d 97, 108 (Mo. App. W.D.1998). The restrictions in this case run with the land. And the covenants obligate the trustees to enforce all of the restrictions against any wayward members. By this contract, the members collectively concede the Association's authority to enforce the covenants.

■ The question boils down to whether the unique nature of this contract removes the case from the realm of Rule 52.10. We conclude that it does. Like a forum selection clause in a contract, the covenant in this case modifies a default rule and confers upon the Association authority that it might not otherwise have absent the contract. Accordingly, the Association does not lack capacity to maintain this action against Ms. Bagwell and Mr. Cutting to enforce the restrictive covenants. This point is denied.

### B. There is Insufficient Evidence to Show That a Quorum Was Present at Any of the Meetings

■ The party seeking to enforce a restrictive covenant "bears the burden of proving the extent and application of its restriction." *Stolba v. Vesci*, 909 S.W.2d 706, 708 (Mo.App. S.D.1995). *See also Perry v. Spavale*, 828 S.W.2d 709, 711 (Mo.App. E.D.1992) ("[P]roponents of the application of a restrictive covenant bear the burden of proving the extent and application of the restriction."). This burden necessarily entails some proof that the process by which the Association adopted the restrictions was valid. *Cf. Connelly v. Schafer*, 837 S.W.2d 344, 348 (Mo.App. W.D.1992) (rejecting contention that proponent of wooden roof restriction had to establish validity of restriction by proof beyond a reasonable doubt, as opposed to a preponderance of the evidence). *See also* 20 Am.Jur.2d *Covenants, Conditions, and Restrictions* § 293 (1995) ("The burden of establishing the existence and the right to the benefit of a restriction is upon the party who asserts it."). "Generally, the meetings of a corporation or association should be conducted in compliance with the constitution and bylaws. Only votes taken in compliance with these rules can effect binding actions." *Nat'l Dev. Co. v. Trusteeship of Woodland Lakes*, 643 F.Supp. 561, 563 (E.D.Mo.1986) (amendments purportedly passed at meetings at which quorum of lot owners was not present were unenforceable).

We recently addressed a comparable problem in *Higginsville Mem'l Post 6270, Veterans of Foreign Wars of the United States v. Benton*, No. WD 60705, —— S.W.3d ——, 2003 WL 41705 (Mo.App. W.D. Jan.7, 2003). *Benton* involved a contract for the sale of real property between

---

**6.** Although the homeowners' association in *Maryland Estates* brought the action to enforce the covenant in its own name, it is unclear from the opinion whether the association was incorporated or unincorporated. Furthermore, the property owner appealing the injunction in *Maryland Estates* did not raise the issue of capacity; the only issue before the court in *Maryland Estates* was the property owner's claim that the association lost the power to control use of the street when the street was dedicated to the public. *See Id.* at 219.

the Bentons and a VFW post that was established as a not-for-profit corporation. The contract contained an option allowing the VFW to repurchase the property at a later date. *Benton,* —— S.W.3d at ——, 2003 WL 41705, at *1. When the Bentons refused to honor the repurchase option, the VFW brought an action seeking, among other things, specific performance of the option or, in the alternative, rescission of the contract. *Id.* On appeal, the Bentons argued that the VFW failed to exercise the repurchase option in accordance with its own internal procedures and bylaws, making any exercise of the repurchase option ineffective. *Id.* at ——, 2003 WL 41705, at *2.

We agreed, finding that the VFW had "failed to prove that a vote was taken" on the repurchase option. *Id.* at ——, 2003 WL 41705, at *4. Reviewing the VFW's bylaws, we noted that they required "a certain number of members to be present in order for a meeting to be held." *Id.* Mr. Benton testified that a meeting could not be held unless a quorum of five members was present. *Benton,* —— S.W.3d at ——, 2003 WL 41705, at *4. We concluded that "[n]one of the evidence presented indicates that at least five members were present for the meeting." *Id.* The only testimony on this point came from the VFW's quartermaster, who said that there were "four or five" members at the meeting. *Id.*

We further noted that the bylaws required any measure to be approved by two-thirds of "those members present and voting." *Id.* at ——, 2003 WL 41705, at *3. We concluded that even if five members were present for a quorum, the record still failed to show that two-thirds of those five voted for the proposal. *Id.* at ——, 2003 WL 41705, at * 4. Absent from

the minutes of the meeting was any mention of a discussion regarding the repurchase option. *Benton,* —— S.W.3d at ——, 2003 WL 41705, at *4. Likewise absent was any mention of a vote on the matter. This we found "odd in view of the fact that the minutes taken at meetings prior to the September 1999 meeting state[d] the number of members present and whether any votes [had] been taken." *Id.* at ——, 2003 WL 41705, at *4. Accordingly, we concluded that there was not substantial evidence to support the judgment that the VFW properly exercised its repurchase option. *Id.* at ——, 2003 WL 41705, at *6.

 As in *Benton,* the Association in this case has failed to furnish proof that it complied with its own rules. The quorum provision in effect at the time that members voted on the contested amendments reads: "A 51% majority of the lot owners or Board of Trustees, that are present at their respective meeting shall constitute a quorum to conduct business." [7]

We have reviewed the contested amendments and the corresponding minutes. We find no evidence recording the number of people present at each meeting or otherwise reciting that a quorum was present at each meeting. These documents declare only that "the owners of lots in Lake Arrowhead subdivision were present to conduct the business of the Association." This breezy recital contrasts conspicuously with the recitals contained in some earlier amendments, which unmistakably declare that "the owners of not less than 51% of the lots in the Lake Arrowhead Subdivision were present to conduct the business of the Association."

In the somewhat analogous corporate context, "it is presumed that a quorum was

---

7. Although the quorum provision is not a model of drafting, the parties appear to agree on its meaning.

present at a shareholders' meeting" but the "presence of those necessary to make a quorum must appear by satisfactory proof." 5 William Meade Fletcher, Fletcher Cyclopedia of the Law of Private Corporations § 2023, at 120 (Perm Ed 1996). Thus, the Missouri Supreme Court has said that "[i]t is the duty of a corporation to keep a record of the minutes of the meetings of its stockholders and directors. Such meetings should show the date when the meetings were held and also *who were present*." *Howard v. Strode*, 242 Mo. 210, 146 S.W. 792, 799 (1912) (emphasis added). *See also* 5A Fletcher § 2188, at 253 (Perm ed 1995) (corporations have duty to keep minutes "showing the meeting dates, action taken, persons present and similar information").

While the minutes corresponding to the contested amendments in this case generally recite the number of votes for and against the contested amendments, this evidence alone is unhelpful in documenting the presence of a quorum. The vote totals at the meetings in question never exceeded 172. There are 2068 lots in the subdivision. While there is evidence that some people and organizations own more than one lot in the subdivision, there is very little evidence showing how many of them own more than one lot or how many lots they own.[8] There is also no evidence to indicate that a large number of people attended the meetings but simply abstained from voting or that a large number of people attended the meetings but were ineligible to vote for some reason. In short, there is no substantial evidence to establish the presence of a quorum.

We disagree with the Association that the Eastern District's opinion in *Brentm-*

*oor Place Residents Ass'n v. Warren*, 816 S.W.2d 7 (Mo.App. E.D.1991), compels a different conclusion. In *Brentmoor*, a homeowner raised an affirmative defense challenging the validity of the homeowners' association's actions for lack of a quorum. *Id.* at 9–10. This account of the evidence appears in the court's opinion:

> On direct examination, Hugill [one of the trustees] testified that attendance at the election was good, but he did not personally know whether more than 50 percent of the Association's members voted at the meeting. When counsel for the Warrens cross-examined Hugill regarding the presence of a quorum, Hugill stated that he had 'no way of knowing' how many people voted at that meeting. On redirect examination, however, Hugill acknowledged that he had testified in the prior hearing that 'about two thirds' of the members voted in the election.

*Id.* at 10.

Based upon this account, *Brentmoor* concluded that the evidence did not support the trial court's finding that the election was invalid for lack of a quorum. *Id.*

One important fact distinguishes the case before us from *Brentmoor*. Unlike the case before us, *Brentmoor* contained some evidence suggesting that "about two-thirds" of the members in that case voted at their homeowners' association meeting. *Id.* at 10. The case before us contains no comparable evidence suggesting that 51% of the lot owners voted, let alone were present, at each meeting. To the contrary, it contains substantial circumstantial evidence—the vote totals—suggesting that a quorum was *not* present at each meeting.

---

8. It appears that National Development Company owns 105 lots in the subdivision and that the Association owns another nine or ten lots. Even so, this concentration of owner-

ship and votes still does not account for the discrepancy between the large number of lots and the comparatively small number of votes recorded at the meetings in question.

Given the lack of evidence documenting the presence of a quorum and the concomitant existence of circumstantial evidence tending to suggest the absence of a quorum, we conclude that there is not substantial evidence to support the trial court's judgment. For this reason, we reverse the trial court's judgment and remand the case for further proceedings. During those proceedings, the trial court may hear additional evidence on this issue.

### IV. CONCLUSION

For the reasons discussed above, we reverse the trial court's judgment and remand the case for further proceedings.

ROBERT G. ULRICH and EDWIN H. SMITH, JJ. concur.