J-A20008-21

**NON-PRECEDENTIAL DECISION - SEE SUPERIOR COURT I.O.P. 65.37**

| | | |
|---|---|---|
| EDGE COMMERCIAL LLC | : | IN THE SUPERIOR COURT OF |
| | : | PENNSYLVANIA |
| Appellant | : | |
| | : | |
| | : | |
| | : | |
| v. | : | |
| | : | |
| | : | |
| | : | |
| PHEPLE FCU, F/K/A WESTMORELAND | : | No. 340 WDA 2021 |
| COUNTY FCU | : | |

Appeal from the Order Entered February 26, 2021
In the Court of Common Pleas of Westmoreland County
Civil Division at No(s): 4773 of 2018

BEFORE:  PANELLA, P.J., BENDER, P.J.E., and McCAFFERY, J.

MEMORANDUM BY PANELLA, P.J.:                **FILED: MARCH 8, 2022**

Edge Commercial LLC appeals from the order granting summary judgment in favor of Pheple FCU, f/k/a Westmoreland County FCU.  Edge argues that it was entitled to a broker's commission from the sale of Pheple's properties. We affirm.

Edge is a licensed real estate broker in Pennsylvania. Pheple is a federal credit union with offices throughout Westmoreland County. On May 17, 2017, Pheple entered into two separate, but nearly-identical, one-year Agreements with Edge, wherein Edge would act as the broker for the sale of two of Pheple's

bank properties, located in Greensburg and Harrison City ("the Properties").[1]

Relevantly, pursuant to Paragraph 9 of the Agreements, Edge was to receive a 5% commission on the sale of the Properties to a buyer under either of the following conditions:

(a) during the Term, you sell the Property to a purchaser, whether procured by us, you or anyone else; or

(b) within ninety (90) days after the expiration of the Term or after the Agreement otherwise terminates (the "Post Term"), the Property is sold to, or negotiations continue, resume or commence and thereafter continue leading to a sale of the Property to any person or entity (including his/her/its successors, assigns or affiliates) with whom, during the Term, EDGE either negotiated (either directly or through another broker or agent) or to whom the Property was submitted during the Term ("Existing Prospect"). You agree that EDGE is authorized to continue negotiations with Existing Prospects, and we will submit to you a list of such Existing Prospects no later than fifteen (15) business days following the expiration or termination of the Term: provided, however, that if a written offer has been submitted prior to said expiration or termination date, then it shall not be necessary to include the offeror's name on the list.

Agreements, 5/17/17, at 2 (unnumbered).

_____

[1] We note that there is some confusion as to when the Agreements were executed and when the one-year term expired. Notably, the Agreements are dated May 9, 2017. However, in its brief, Edge first states the agreements ended on May 13, 2018, *see* Brief for Appellant at 6, but later indicates that the one-year term ended on May 17, 2018, *see id.* at 12. For its part, Pheple used the latest possible date, May 17, 2018, as the date of the Agreements' termination, suggesting that the later date has no bearing on the ultimate outcome in this matter. *See* Brief for Appellee at 2 n.1. As this issue is not material to our disposition, we will also utilize May 17, 2018, as the expiration date of the Agreements.

During the original one-year term, no written offer for the Properties was submitted to Pheple or Edge. Further, upon the expiration of the Agreements, Edge did not provide Pheple a written list of any "Existing Prospects." On July 7, 2018, after the expiration of the Agreements, but during the Post-Term period, Shannon Hoffman ("Shannon"), a financial officer at Pheple, encountered Ryan Glista, CFO of InFirst Bank, at the Ligonier Country Market. At that time, Shannon indicated to Glista that Pheple was attempting to sell the Properties, and that InFirst should contact Maria LaVell, Pheple's CEO, if it was interested. InFirst's CEO, Tim Kronenwetter, contacted LaVelle on July 9, 2018, and LaVelle informed Pheple's chief strategic officer, Charles Frederickson, who was overseeing the sale of the Properties, of InFirst's interest. Kronenwetter and Frederickson exchanged phone calls and emails starting July 10, 2018, regarding the Properties. Notably, none of these exchanges suggest that Edge had contacted InFirst prior to the encounter between Shannon and Glista.

On July 13, 2018, Frederickson informed Cory Hoffman ("Hoffman"), a principal and broker for Edge, regarding InFirst's interest in purchasing the Properties. Frederickson and Kronenwetter met on July 31, 2018, for a tour of the Properties. No one from Edge attended the tour. Subsequently, principals of Pheple and InFirst, and Hoffman, met regarding the Properties.

On August 27, 2018, Frederickson received proposed "Letters of Intent" from Kronenwetter. Frederickson contacted Hoffman, asking for him to review

the Letters. Thereafter, Pheple approved the "Letters of Intent" for the Properties, with minor changes.[2]

On August 30, 2018, Hoffman met with Frederickson, seeking Edge's commission. Frederickson indicated that Pheple had no obligation to pay a commission to Edge, as InFirst had been procured independently by Pheple, following the expiration of the one-year term of the Agreements.

On October 12, 2018, Edge sent a letter containing a "Notice of Intent to File Commercial Real Estate Broker Lien" to LaVelle and Kronenwetter and claimed that Edge was entitled to a 5% commission on the sales. Subsequently, Edge filed a complaint, and, thereafter, an amended complaint, raising a breach of contract against Pheple for failing to pay the broker's commission under the Agreements. Pheple filed an answer, new matter, and counterclaim. Edge filed its reply to new matter, and answer to the counterclaim. Notably, due to Edge's lawsuit and the conveyance of the Properties to InFirst, an escrow fund in the amount equal to the alleged broker's commissions — $85,000 for the Harrison City property and $50,000 for the Greensburg property — was created.

The trial court then ordered discovery. Notably, Hoffman provided a verified statement, stating that Edge distributed sales materials and

---

[2] The closing for the sale of the Harrison City property to InFirst was conducted on May 31, 2019, and the closing for the sale of the Greensburg property was conducted on August 30, 2019.

promotional booklets describing the Properties to specific banks and financial institutions, including InFirst, during the original one-year term of the Agreements. Hoffman further indicated that he attended a meeting between Pheple and InFirst at Pheple's request; Pheple introduced him as Pheple's broker to InFirst; Frederickson provided Hoffman with the proposed Letters of Intent; Hoffman provided suggestions and revisions to the Letters; and Frederickson and other representatives of Pheple continually assured Hoffman that Edge would be paid the commission in accordance with the Agreements.

For its part, Pheple presented affidavits from Shannon, Lista, and Kronenwetter, who all indicated that InFirst did not learn that the Properties were for sale prior to the encounter of Shannon and Glista on July 7, 2018; no one from InFirst received any marketing materials or promotional brochures from Edge with respect to the Properties prior to the one-year expiration of the Agreements; and no one from Pheple was approached or contacted by InFirst prior to Kronenwetter's call with LaVelle in July 2018.

Further, during discovery, Pheple served Edge with requests for admissions, interrogatories, and requests for production of documents. Relevantly, Edge admitted that it could not provide the name or date that the brochures or sales materials were delivered to InFirst, indicating that any purported emails containing such information could not be produced, because they had not been retained due to their large file size.

Thereafter, Pheple filed a motion for summary judgment, arguing that Edge was not entitled to a commission on the sale of the Properties under the Agreements. Following a hearing, the trial court granted Pheple's motion. This timely appeal followed.

On appeal, Edge raises the following questions for our review:

1. Did the [trial] [c]ourt err in holding that InFirst was not an "existing prospect?"

2. Did the [trial] [c]ourt fail to view the evidence in the light most favorable to the non-moving party?

3. Did the [trial] [c]ourt err in holding that Edge's failure to provide a list of "existing prospects" was a condition precedent to Edge's right to receive a commission?

Brief for Appellant at 4.

Our review of an order granting summary judgment entails reviewing the evidence of record to determine if there is a triable issue of fact:

> Pennsylvania law provides that summary judgment may be granted only in those cases in which the record clearly shows that no genuine issues of material fact exist and that the moving party is entitled to judgment as a matter of law. The moving party has the burden of proving that no genuine issues of material fact exist. In determining whether to grant summary judgment, the trial court must view the record in the light most favorable to the non-moving party and must resolve all doubts as to the existence of a genuine issue of material fact against the moving party. Thus, summary judgment is proper only when the uncontroverted allegations in the pleadings, depositions, answers to interrogatories, admissions of record, and submitted affidavits demonstrate that no genuine issue of material fact exists, and that the moving party is entitled to judgment as a matter of law. In sum, only when the facts are so clear that reasonable minds cannot differ, may a trial court properly enter summary judgment.

On appeal from a grant of summary judgment, we must examine the record in a light most favorable to the non-moving party. With regard to questions of law, an appellate court's scope of review is plenary. The Superior Court will reverse a grant of summary judgment only if the trial court has committed an error of law or abused its discretion. Judicial discretion requires action in conformity with law based on the facts and circumstances before the trial court after hearing and consideration.

*Weible v. Allied Signal, Inc.*, 963 A.2d 521, 525 (Pa. Super. 2008) (citation and brackets omitted).

We will address Edge's first and third claims together as they are interrelated. Edge contends that it was entitled to a broker's commission because InFirst was an Existing Prospect under the Agreements. *See* Brief for Appellant at 10, 11-12. Specifically, Edge maintains that it delivered promotional booklets describing the Properties to InFirst during the term of the Agreements; the negotiations with InFirst commenced on July 13, 2018, well within 90 days after the expiration of the Agreements; and the negotiations resulted in the ultimate sale of the Properties. *See id.* at 12. Edge claims that it did not need to provide Pheple a list of Existing Prospects because the language in the Agreements did not expressly make such a requirement a condition precedent to obtain its commission on the sales. *See id.* at 17, 18-19. In any event, Edge baldly argues that correspondence between Hoffman and Frederickson after July 2018 revealed that Pheple was aware of Edge's dealings with InFirst. *See id.* at 17.

To address Edge's arguments, we must construe the Agreements according to contract law principles.

- 7 -

> In interpreting a contract, the ultimate goal is to ascertain and give effect to the intent of the parties as reasonably manifested by the language of their written agreement. When construing agreements involving clear and unambiguous terms, this Court need only examine the writing itself to give effect to the parties' understanding. This Court must construe the contract only as written and may not modify the plain meaning under the guise of interpretation.

*Stephan v. Waldron Elec. Heating & Cooling LLC*, 100 A.3d 660, 665 (Pa. Super. 2014) (citation omitted). Further, "[w]e emphasize that the contract must be interpreted as a whole, and an interpretation that gives effect to all of the contract's provisions is preferred." *Gaffer Ins. Co. v. Discover Reinsurance Co.*, 936 A.2d 1109, 1113 (Pa. Super. 2007) (citations omitted).

By their plain terms, the Agreements expired one year after their execution — May 17, 2018. *See* Agreements, 3/17/17, at 1 (unnumbered). Relevant herein, under Paragraph 9 in the Agreements, Edge earned a sales commission if, during the 90-day "Post-Term" period, negotiations commenced and thereafter led to the sale of the Properties to an "Existing Prospect," a person or entity to whom the Properties were "submitted" by Edge during the one-year term. *See id.* at 2 (unnumbered).[3] Moreover, Edge

---

[3] Notably, the Agreements are silent as to the definition of "submitted;" however, the plain and ordinary meaning of "submitted" in this context is "to present or propose to another for review, consideration, or decision[;] also: to deliver formally[.]" http://www.merriam-webster.com/dictionary/submitted; *see also True R.R. Assocs., L.P. v. Ames True Temper, Inc.*, 152 A.3d 324, 339 (Pa. Super. 2016) (stating that that words in a contract "are to be
*(Footnote Continued Next Page)*

agreed to provide a list of the Existing Prospects to Pheple within 15 business days of the expiration of the one-year term. ***See id.***

It is undisputed that negotiations between Pheple and InFirst commenced 57 days after the expiration of the Agreements, well within the "Post-Term" period. Further, it is undisputed that Edge did not identify InFirst as an existing Prospect within 15 business days of the expiration. Hence, it is undisputed that Edge breached the Agreements before the alleged breach by Pheple.

However, Edge's breach only relieved Pheple of its duty to perform under the Agreements if Edge's breach was a material breach.[4] ***See Widmer Eng'g. Inc. v. Dufalla***, 837 A.2d 459, 467 (Pa. Super. 2003). "Whether a breach is so substantial as to justify an injured party's regarding the whole transaction as at an end is a question of degree[.]" ***Id.*** at 468. To evaluate how substantial Edge's breach was, we must consider, among other factors, whether Edge's failure comports with standards of good faith and fair dealing. ***See id.***

---

construed in their natural, plain, and ordinary sense, ... and we may inform our understanding of these terms by considering their dictionary definitions") (citation omitted).

[4] To the extent our analysis differs from the trial court's, we note that we may affirm the trial court's order on any valid basis. ***See Plasticert, Inc. v. Westfield Ins. Co.***, 923 A.2d 489, 492 (Pa. Super. 2007).

Here, we note that the "Post-Term" period provided for under the Agreements was intended to protect Edge from being deprived of a commission that it had earned by marketing the properties during the term of the Agreements, but which did not bear fruit until shortly after the Agreements terminated. Given this reasonable provision, the "Existing Prospects" list required by the Agreements served two purposes. First, to protect Edge's interest in a commission it had earned by the provision of objective evidence of Edge's marketing efforts. Through the timely provision of the list, Edge would create a record not only of who it had marketed the properties to, but also provide notice to Pheple of its protected interests. Perhaps more importantly, however, the list also served the purpose of limiting Pheple's liability under the Agreements. In the absence of a timely "Existing Prospects" list, Pheple could not be sure that any negotiations started within 90 days of the expiration of the Agreements would not require a commission to Edge. The list would provide timely, objective evidence of the third parties Edge considered covered by the "Post-Term" period of the Agreements. In other words, the "Existing Prospects" list was Pheple's protection against nuisance lawsuits based purely on unsupported claims of submission of marketing materials.

This second purpose is completely negated by the state of the record here. The only evidence establishing that InFirst was an "Existing Prospect" was the verified statement of Hoffman, a broker for Edge, stating that Edge

provided promotional sales materials for the Properties to InFirst during the one-year term of the Agreements, and, therefore, InFirst was an Existing Prospect. **See** Hoffman Verified Statement, 9/14/20, at 3 (unnumbered). However, Hoffman's averments are belied by Edge's admissions that it could not name the person to whom the promotional materials were delivered or the date of delivery, and that the alleged emails containing such information were not retained. **See** Edge's Response to Second Set of Requests for Admission, Interrogatories and Requests for Production, No. 14–17; **see also** Pa.R.C.P. 4014(d) (noting that when a matter is admitted under Rule 4014, the substance of that admission "is conclusively established"). Furthermore, InFirst's President and CEO, Kronenwetter, stated that no discussions had ever taken place with either Pheple or Edge concerning the availability and proposed sale of the Properties, prior to the Shannon's encounter with Glista on July 7, 2018. **See** Kronenwetter Affidavit, 1/3/19, at 1 (unnumbered).

Accordingly, Edge's failure to provide an "Existing Prospects" list to Pheple 15 days after the expiration of the Agreements represents a material breach of the Agreements. If Edge had objective evidence of its marketing efforts to InFirst, its breach of the "Existing Prospects" list requirement would not necessarily be material. But as Edge cannot support its claim with any evidence other than the statement of Hoffman, Pheple's interest in being free from nuisance lawsuits seeking some sort of settlement in lieu of costly litigation is entirely voided. To be clear, we are not finding that Edge's filing

of this action was in fact a nuisance action; rather, we are merely holding that Edge's failure to provide the required list, when combined with Edge's failure to preserve any objective evidence of its marketing efforts to InFirst, represents a material breach of the Agreements.

Edge correctly argues that this provision of the Agreements is not a condition precedent that alone would prevent recovery of the broker's commission. **See Lesko v. Frankford Hosp.-Bucks Cty.**, 15 A.3d 337, 342 (Pa. 2011). However, we do not conclude that the "Existing Prospects" list constitutes a condition precedent. Rather, as explained above, we merely hold that Edge's failure to timely provide the list constituted a material breach where it has presented no objective evidence of its marketing efforts to InFirst.

Additionally, we reject Edge's reliance upon **Pittsburgh Commercial Real Estate v. Baum Blvd. Investors, LP**, 44 Pa. D.&C.5th 498 (Allegheny Co. 2015), to support its claim.[5] There, the broker entered into a six-month agreement to lease the real estate investor's property. **See Pittsburgh Commercial**, 44 Pa. D.&C.5th at 499-500. Notably, following the expiration of six-month term, the agreement included a post-term period during which the broker could obtain fees if the property had been "submitted" to the ultimate tenant of the property during the term of the agreement. **See id.** at

---

[5] "We note that decisions of the Courts of Common Pleas are not binding precedent for the appellate courts, but may be considered for their persuasive authority." **Huber v. Etkin**, 58 A.3d 772, 779 n.5 (Pa. Super. 2012) (*en banc*).

500. The agreement also provided that the broker had to provide a list of prospects upon the expiration of the agreement. *See id.*; *see also id.* at 502 (finding that the failure to provide the list is not a condition precedent to obtain the commission as the contract does not condition the commission upon providing the list). The broker submitted the property to the eventual tenant during the six-month period, and the investor was aware of these contacts; ultimately, the property was leased to the tenant. *See id.* at 501, 505-07. Further, while the broker did not timely provide a contractually mandated list of existing prospects, it did provide the list to the investor. *See id.* at 507-08. The trial court found that under these circumstances, the broker was entitled to the commission. *See id.* at 512.

Unlike **Pittsburgh Commercial**, there is no objective evidence that Edge submitted the Properties to InFirst during the term of the Agreements, and Edge never provided a list of the Existing Prospects to InFirst.[6] In light of

---

[6] Likewise, we also reject Edge's reliance upon **TEC Realtors, Inc. v. D & L Fairway Property Management, LLC**, 42 So.3d 1116, 1126 (La. App. 2010) (concluding that the broker was entitled to a commission for submitting the property based upon the broker's telephone to the buyer during the listing period); and **Gardner v. Blahnik**, 832 S.W.2d 919, 922-23 (Mo. App. 1992) (holding that a broker's submission of a property to the buyer could recover a commission, even though he never showed the property to the ultimate buyer). Nevertheless, we note that "[t]his Court is not bound by the decisions of federal courts, other than the United States Supreme Court, or the decisions of other states' courts on a matter of Pennsylvania law." **Branham v. Rohm & Haas Co.**, 19 A.3d 1094, 1103 (Pa. Super. 2011) (citation omitted).

- 13 -

Edge's material breach of the Agreements, we conclude that Pheple is entitled to judgment as a matter of law.

In its second claim, Edge contends that the trial court failed to view the evidence in a light most favorable to Edge, the non-moving party. **See** Brief for Appellant at 15. Edge argues that the trial court relied upon evidence from Pheple that InFirst did not learn of the Properties until the expiration of the Agreements and ignored that Hoffman stated that Edge had provided promotional materials to InFirst during the original term. **See id.** at 15-16. Edge further asserts that the trial court disregarded evidence that Pheple urged Edge to continue as the broker following the expiration of the Agreements, noting that Hoffman met with representatives of Pheple and InFirst, and Hoffman offered suggestions to the Letters of Intent. **See id.** at 16-17.

As noted above, Edge's material breach of the requirement to timely provide a list of "Existing Prospects" to Pheple precludes any relief to Edge under the circumstances of this case. Even taking all evidence presented in the light most favorable to Edge, Edge cannot overcome this legal conclusion. Moreover, Hoffman's contacts with Pheple and InFirst *after* the expiration of the one-year term of the Agreements does not establish that Edge was entitled to a commission under the Agreements. Accordingly, we cannot grant Edge relief on this basis, and the trial court properly granted summary judgment in favor of Pheple.

Order affirmed.

Judgment Entered.

Joseph D. Seletyn, Esq.
Prothonotary


Date:  03/08/2022