15 A.3d 337

**Jeanne LESKO, as Executrix of the Estate of Kathleen Bernath, Appellee**

**v.**

**FRANKFORD HOSPITAL–BUCKS COUNTY, Frankford Healthcare System, Inc., Jefferson Health System, Inc., Frankford Hospitals, Appellants.**

**Jeanne Lesko, as Executrix of the Estate of Kathleen Bernath, Appellee**

**v.**

**Frankford Hospital–Bucks County, Frankford Healthcare System, Inc., Jefferson Health System, Inc., Frankford Hospitals, Appellants.**

Supreme Court of Pennsylvania.

Argued May 11, 2010.

Decided Jan. 19, 2011.

116

Bruce W. Kauffman, Philadelphia, John M. Elliott, Elliott Greenleaf & Siedzikowski, P.C., Stewart John Greenleaf, Jr., Frederick P. Santarelli, Blue Bell, Robert C. Daniels, Philadelphia, for Frankford Hospital-Bucks County, Frankford Healthcare System, Inc., et al.

Thomas R. Kline, Andrew Joseph Stern, Charles Lyman Becker, Kline & Specter, P.C., Philadelphia, for Jeanne Lesko.

BEFORE: CASTILLE, C.J., SAYLOR, EAKIN, BAER, TODD, McCAFFERY, ORIE MELVIN, JJ.

## OPINION

Justice EAKIN.

In 2004, Kathleen Bernath brought a medical malpractice claim against appellants for injuries sustained following surgery at Frankford Hospital. In 2005, she entered into a written settlement agreement with appellants. Section 1.4 of the agreement provided, "[Bernath] acknowledges and agrees that the release and discharge set forth above is a general release.... The total consideration as outlined in Sections 2.0, 2.1, 2.2 and 2.3 below is in the amount of Six Million Three Hundred Thousand Dollars ($6,300,000.00)." Settlement Agreement, 12/12/05, at 3, § 1.4. Sections 2.1 and 2.2 stated medical insurance and appellants would directly pay Bernath lump sums of $400,000 and $4,239,890, respectively. *Id.*, at 3–4, § 2.1–2.2. Of particular importance, Section 2.3 provided:

Frankford Hospital of the City of Philadelphia agrees to make payment in the following manner:

(i) The sum of Twenty Thousand Dollars ($20,000.00) per month commencing on or about January 15, 2006. Said payment of Twenty Thousand Dollars ($20,000.00) per month shall continue for the life of Kathleen Bernath. Said payment of Twenty Thousand Dollars ($20,000.00) per month shall increase by Four Percent (4.00%) compounded annually effective each anniversary of commencement date. No payments shall be due on or after the date of Kathleen Bernath's death.

*Id.,* at 4, § 2.3. Bernath agreed these periodic payments could not be accelerated, deferred, increased, or decreased. *Id.,* at 5, § 3.0. Frankford Hospital reserved the right to fund the periodic payment liability via the purchase of an annuity policy from New York Life Insurance and Annuity Company, which would then take full responsibility for the obligations of Section 2.3. *Id.,* at 6, § 5.0. Bernath specifically agreed to this assignment. *Id.,* at 5, § 4.1.

In accordance with the agreement, Frankford Hospital issued a $4,239,890 check to Bernath. It also issued a $1,660,100 check to New York Life for the annuity purchase, but some two weeks after the check was sent to New York Life, Bernath died. Though Frankford Hospital had sent the check to New York Life, at the time of Bernath's death, the annuity contract had not yet been executed. Frankford Hospital asked New York Life to refund the $1.6 million check, claiming the annuity obligation was premised on Bernath being alive at the time the payments commenced. Appellee, as executrix of Bernath's estate, challenged the claim and requested the $1.6 million be paid to the estate.

After several months of complicated procedural history, the trial court ordered appellants to pay Bernath's estate $1,660,110. The trial court found the settlement agreement unambiguously revealed the parties' intent that the total to be paid was $6.3 million, and appellants' portion of that amount was $5.9 million—the $4.24 million lump sum and the $1.6 million paid to New York Life to fund the annuity. Trial

Court Opinion, 11/1/07, at 14. It held the obligation to pay the annuity arose when the parties entered into the agreement; thus, as Bernath's death made the annuity purchase impossible, the $1.6 million should be paid to her estate. *Id.*

Appellants appealed, and the Superior Court affirmed, finding the duty to pay the $1.6 million to obtain an annuity was not stipulated upon an event but arose when the contract was executed. *Lesko v. Frankford Hospital,* No. 2327 & 2328 EDA 2007, unpublished memorandum at 10 (Pa.Super. filed October 15, 2008). The court believed appellants recognized their obligation to pay the $1.6 million by sending the check to New York Life to purchase the annuity, and would not have contracted to pay the $20,000 per month annuity themselves because Bernath might have remained alive for many years, costing appellants more than the agreed upon amount. *Id.* The Superior Court concluded changed circumstances, which made it impossible for appellants to purchase the agreed upon annuity, failed to release them from their promise to pay Bernath's estate the entire amount specified in the settlement agreement; instead, only the form of the obligation changed following her death, and the estate was owed $1.6 million to satisfy the $6.3 million "total consideration" mentioned in the contract. *Id.,* at 11. We granted allocatur to review whether the Superior Court's determination that the settlement agreement requires appellants to pay Bernath's estate $1,660,100 contravenes contract interpretation principles. *Lesko v. Frankford Hospital–Bucks County,* 604 Pa. 350, 986 A.2d 62, 62–63 (2009).

Appellants contend the trial court and Superior Court rewrote the settlement agreement, disregarding its unambiguous language to create an obligation contrary to the parties' intent. They maintain the agreement clearly states no payments were due after Bernath's death, and the fact she passed away mere months after the contract was created does not negate the agreement. Appellants contend the total consideration could not be limited to $6.3 million because it was impossible to foresee how long Bernath would live; if the consideration were indeed limited to $6.3 million, she would

have received the total consideration after only six years and two months of receiving payments.

Appellants dispute the trial court's reliance on the "total consideration" clause found in Section 1.4, claiming it is an isolated sentence in a "non-payment" section of the contract, which is clearly qualified by the specific sections pertaining to payment. They argue the specific provisions of the contract would be obliterated and rendered meaningless if the one portion addressing "total consideration" were given the effect the lower courts approved, which is impermissible. *See Baltic Development Co. v. Jiffy Enterprises, Inc.*, 435 Pa. 411, 257 A.2d 541, 543 (1969) (citation omitted) (specific provisions govern general provisions).

Appellants argue there was no obligation in the contract requiring Frankford Hospital to purchase an annuity, only the option to do so. They contend, even if there were such an obligation, the party's performance was made impossible by Bernath's death; as her survival was a basic premise of the contract, performance is now impossible, and appellants' duty is discharged. *See* Restatement (Second) of Contracts § 261 (1981) (where, without fault, contract performance is made impracticable by occurrence of event the non-occurrence of which was basic assumption of contract formation, duty to render that performance is discharged unless language or circumstances indicate otherwise).

Appellants also argue the Superior Court made improper findings of fact on appeal when it found "[a]ppellants drafted the contract, and therefore the agreement must be construed against them." *Lesko*, at 10 (citation omitted). Appellants contend this finding is impermissible because the trial court never found appellants drafted the contract anywhere in the opinion. Yet, even if this were true, appellants argue both parties recognize the agreement as unambiguous, and a court may not rely on the rule for construing it against the drafters when the contract is free from ambiguity.

In response, appellee maintains appellants owe $1,660,110 to Bernath's estate because the agreement was drafted to release

the medical malpractice claims in exchange for the unconditional sum of $6.3 million. She maintains Section 2.0, referring to "Payments," sets forth only the method of how Bernath was to be paid: namely, appellants were to buy an annuity, which, though not expressly stated in the contract, cost $1.6 million. Appellee believes appellants had no discretion to make payments on their own but were obligated to pay $5.9 million to settle the claims, via a $4.24 million direct payment and a $1.6 million annuity purchase. She contends appellants recognized their obligation to pay the $5.9 million when they issued a $1.6 million check to New York Life and stated in a letter to counsel that "the settlement drafts totaling $5.9 million dollars (a portion of that amount is funding an annuity) have been forwarded to the appropriate parties." *See* Letter, 12/8/05, Ex. C.

Appellee admits appellants' obligations would be fulfilled had the annuity contract been signed during Bernath's lifetime, because they would have paid the $5.9 million necessary to settle the claim. However, because Bernath died prior to contract execution, appellee maintains her death did not reduce the overall obligation to pay the $5.9 million. She contends appellants' obligation to fund the annuity purchase was not conditional on Bernath being alive when the first payment was to be made, and argues the language stating no monthly payments would be due on or after her death refers only to the payments under the annuity contract, not appellants' threshold obligation to pay $5.9 million to settle appellee's claims. She believes the obligation to pay $5.9 million became effective when the settlement agreement was executed, and was not nullified or reduced by later events. She argues appellants must fulfill their commitment to pay $5.9 million, even if the method of payment has changed due to a changed circumstance; otherwise, Bernath would be denied the benefit of the bargain.

In beginning our analysis, we note settlement agreements are governed by contract law principles. *Mazzella v. Koken,* 559 Pa. 216, 739 A.2d 531, 536 (1999).

[W]hen a written contract is clear and unequivocal, its meaning must be determined by its contents alone. It speaks for itself and a meaning cannot be given to it other than that expressed. Where the intention of the parties is clear, there is no need to resort to extrinsic aids or evidence. Hence, where language is clear and unambiguous, the focus of interpretation is upon the terms of the agreement as *manifestly expressed,* rather than as, perhaps, silently intended.

*Steuart v. McChesney,* 498 Pa. 45, 444 A.2d 659, 661 (1982) (citation and internal quotations omitted) (emphasis in original). The meaning of an unambiguous contract presents a question of law for which our review is *de novo. Seven Springs Farm, Inc. v. Croker,* 569 Pa. 202, 801 A.2d 1212, 1215 n. 1 (2002).[1]

▮▮▮▮ "The fundamental rule in contract interpretation is to ascertain the intent of the contracting parties. In cases of a written contract, the intent of the parties is the writing itself." *Insurance Adjustment Bureau,* at 468 (citations omitted). "[I]n determining the intent of the contracting parties, all provisions in the agreement will be construed together and each will be given effect. . . . [This Court] will not interpret one provision of a contract in a manner which results in another portion being annulled." *LJL Transportation, Inc. v. Pilot Air Freight Corporation,* 599 Pa. 546, 962 A.2d 639, 647–

---

1. We specifically note our disagreement with the Superior Court's decision to construe the agreement against appellants as drafters of the contract. Citing our decision in *Insurance Adjustment Bureau, Inc. v. Allstate Insurance Company,* 588 Pa. 470, 905 A.2d 462, 468 (2006), the Superior Court found, "We note first that Appellants drafted the contract and therefore the agreement must be construed against them." *Lesko,* at 10. In making this conclusion, the court apparently relied on the trial court opinion's statement that "[a]ppellants offered a written 'Settlement Agreement and Release' to Ms. Bernath." Trial Court Opinion, 12/1/07, at 8. However, "[w]hen the terms of a contract are clear and unambiguous, the intent of the parties is to be ascertained from the document itself." *Insurance Adjustment Bureau,* at 468. The trial court found the settlement agreement to be unambiguous, Trial Court Opinion, 11/1/07, at 14, and neither party argues to the contrary. Accordingly, there is no need to construe the language against either party, and our only task is to consider the four corners of the document. *Steuart,* at 661.

48 (2009) (citations omitted). "[A]n act or event designated in a contract will not be construed as a condition unless that clearly appears to be the intention of the parties." *Shovel Transfer and Storage, Inc. v. Pennsylvania Liquor Control Board*, 559 Pa. 56, 739 A.2d 133, 139 (1999) (citations omitted).

Having reviewed the plain language of the settlement agreement, we cannot agree it was ever the parties' intention that Bernath receive a total payment of $6.3 million; accordingly, we cannot agree with the conclusion that appellants are obligated to pay $1,660,110 to Bernath's estate.

Appellee believes Bernath's death prior to the annuity contract execution did not reduce the obligation to fund the annuity purchase because the obligation was not conditional on Bernath being alive when the first payment was to be made. She acknowledges appellants would be free from all obligations if the annuity contract had been executed, and even recognizes New York Life would have kept the $1.6 million appellee claims belongs to Bernath's estate had the simple act of assignment taken place just one day earlier. However, while the contractual language indicates Frankford Hospital planned to purchase the annuity, and had Bernath's approval to exercise such an option, the language only reserves appellants the right to purchase the annuity. It never obligates them to do so.

Appellee suggests the obligation to purchase the annuity comes from the language stating "Frankford Hospital of the City of Philadelphia will make a 'qualified assignment', . . . of [its] liability to make the Periodic Payments . . . to New York Life Insurance and Annuity Corporation." Settlement Agreement, 12/12/05, at 5, § 4.1. Read in context, the applicable portion states, "The Plaintiff acknowledges and agrees that Frankford Hospital of the City of Philadelphia will make a 'qualified assignment', . . . of [its] liability to make the Periodic Payments . . . to New York Life Insurance and Annuity Corporation." *Id.*[2] This language does not obligate Frank-

2. Appellee also cites language in Sections 4.2, 5.0, 6.0, and 13.0 of the settlement agreement as obliging appellants to purchase an annuity.

ford Hospital to make the purchase, but is located in the portion of the agreement wherein Bernath agreed to allow Frankford Hospital to purchase an annuity. Thus, appellants had an option, but not an obligation, to purchase an annuity.

If appellants had chosen not to exercise their right to purchase the annuity, but opted instead to pay out of their own pocket, Bernath's estate would have no claim to the $1.6 million because the language of the contract clearly states the periodic payments cease upon her death. This point is of vital importance because it is precisely the situation in which the parties found themselves at the time of Bernath's unfortunate passing.

That is to say, appellants retained the obligation to fund the periodic payments out of their own pocket prior to execution of the annuity contract. If, for example, New York Life had refused to accept the annuity assignment and returned the $1.6 million, appellants would still have been responsible for the periodic payments until a willing assignee could be found. That Bernath died before the obligation was assigned is therefore immaterial because she had no right to the payments after death, regardless of who was funding the payments. Because the annuity contract had not yet been finalized, appellants still retained the obligation to fund the payments—an obligation which clearly ended upon Bernath's death regardless of who possessed the obligation at the time of that event.

██  Having determined appellants were not obligated to purchase an annuity under the contract, we now turn to the "total consideration" clause. We agree with appellants' argu-

See Appellee's Brief, at 17–19. Appellee's choice of citations is revealing, as she cites commanding language within a provision, but neglects to give the citations context. Read in their entirety, it is clear these sections relate to Bernath's consent to appellants' assignment of their periodic payment duty via the purchase of an annuity, and state and define New York Life's responsibilities as assignee of that duty. Settlement Agreement, 12/12/05, at 5–6, 8, § 4.2, 5.0, 6.0, 13.0. The language appellee claims requires appellants to act establishes intent and consent, not obligation and duty; while the contract clearly assumes appellants would exercise their option to purchase an annuity, no language obligates such an act.

ment that the specific provisions of the contract would be disregarded and rendered meaningless if one general sentence referring to "total consideration" governed the outcome of the entire settlement agreement. This is especially true in light of the fact that the same sentence naming the general amount owed under the contract is clearly qualified by specific contractual provisions. Settlement Agreement, 12/12/05, at 3, § 1.4 ("The total consideration *as outlined in Sections 2.0, 2.1, 2.2 and 2.3* below is in the amount of Six Million Three Hundred Thousand Dollars") (emphasis added); *Baltic,* at 543 (specific provisions govern general provisions).

After considering the "total consideration" clause in light of the specific "payment" provisions which must qualify it, it is apparent the $6.3 million amount is not "unconditional" as appellee argues. Notably, the specific "Payment" provisions never state Bernath was entitled to $1.6 million. The much-disputed figure is never actually mentioned in the contract, and is achieved by subtracting the two lump sums from the $6.3 million total consideration amount mentioned in Section 1.4. However, as appellants point out, if Bernath were expecting to receive $1.6 million, she would have accumulated that amount simply by living a little more than six years after the agreement's execution; she may have received much less if she died earlier.

We must therefore conclude the parties' intent was not that Bernath receive a total of $6.3 million, but that she receive the two lump sums and $20,000 per month for the rest of her life. As she was not expecting to receive a true payment of $6.3 million under the agreement, but more or less depending upon her date of death, her estate is not now entitled to a lump sum of $1.6 million.

Appellee contends Bernath's estate would lose the benefit of the bargain if appellants were permitted to keep the $1.6 million because their obligation in settling the claims was to pay $5.9 million. However, it must be noted that the benefit of the bargain is whatever the parties are willing to exchange. For example, in *Emerson v. Adult Community Total Services, Inc.,* 842 F.Supp. 152, 154 (E.D.Pa.1994), an 83-year-old man

paid a one-time $83,000 entrance fee to a nursing home for lifetime care and then died several months later. The federal court, applying Pennsylvania law, said the contract was valid because the gentleman could have lived much longer and knew the potential existed that he might not outlive the costs initially paid. *Id.*, at 157. While the annuity contract in the current case was not finalized, we nonetheless find *Emerson* instructive. The elderly gentleman in *Emerson* exchanged $83,000 in order to receive care for however long he remained alive—fully knowing that, at the age of 83, his years were approaching an end. To him, $83,000 was a satisfactory amount to pay for that remaining time, and he received the benefit of the bargain despite the fact he only enjoyed that benefit for a short period. Similarly, Bernath was fully aware she was contracting to receive $20,000 per month for the rest of her life, and the payments would cease upon her death. If she had wanted to include a clause allowing for the remainder or full payment of the $1.6 million to her estate in the event of her death, she could have done so. That she chose not to include such a safeguard does not negate the agreement nor rob her of the benefit of the bargain.

We conclude appellants had no threshold obligation to pay $5.9 million to Bernath, but to directly pay her $4,239,890 and $20,000 per month, with the option to assign that duty to New York Life by buying an annuity for $1.6 million. That the annuity contract was not executed prior to Bernath's death is immaterial, as the unambiguous language of the settlement agreement terminated the periodic payments upon death. As Bernath did not agree to receive a $1.6 million lump sum, but rather $20,000 periodic payments to end upon her death, appellants are not now obligated to provide Bernath's estate with what Bernath herself did not bargain for, and are entitled to recoup the money sent to New York Life.

The order of the Superior Court is reversed.

Jurisdiction relinquished.

Chief Justice CASTILLE and Justices BAER, TODD, McCAFFERY and ORIE MELVIN join the opinion.

Justice SAYLOR files a concurring opinion.

Justice SAYLOR, concurring.

It seems clear to me that the timing of Mrs. Bernath's death frustrated a material aspect of the settlement agreement—providing a stream of payments to meet her ongoing needs—as no payments ever ensued. Nevertheless, I support the majority's holding that the relief awarded by the common pleas court, namely, enforcement of a payment term which does not appear in the agreement, is unavailable.