J-A09030-17

**NON-PRECEDENTIAL DECISION - SEE SUPERIOR COURT I.O.P. 65.37**

| | |
|---|---|
| DEBRA KENNEDY-SMITH, | IN THE SUPERIOR COURT OF PENNSYLVANIA |
| Appellant | |
| v. | |
| MILROY HOSPITALITY, LLC, | |
| Appellee | No. 1509 MDA 2016 |

Appeal from the Order Entered August 16, 2016
In the Court of Common Pleas of Mifflin County
Civil Division at No(s): CP-44-CV-1171-2012

| | |
|---|---|
| DEBRA KENNEDY-SMITH, | IN THE SUPERIOR COURT OF PENNSYLVANIA |
| Appellee | |
| v. | |
| MILROY HOSPITALITY, LLC, | |
| Appellant | No. 1559 MDA 2016 |

Appeal from the Order Entered August 16, 2016
In the Court of Common Pleas of Mifflin County
Civil Division at No(s): CP-44-CV-1171-2012

BEFORE:  GANTMAN, P.J., SHOGAN and OTT, JJ.

MEMORANDUM BY SHOGAN, J.:　　　　　**FILED OCTOBER 12, 2017**

These cross appeals are from an order denying the petition of Debra Kennedy-Smith ("Kennedy-Smith") and granting, in part, the cross-petition of Milroy Hospitality, LLC ("Milroy") to enforce a settlement agreement (the "Settlement Agreement").  We affirm in part, vacate in part, and remand.

The Settlement Agreement provides the following background:

WHEREAS, on or about June 6, 2011 Milroy entered into a written commercial lease agreement (hereinafter "Lease") with Subway Real Estate, LLC for Suite 200/B of a shopping plaza located at 15 Commerce Drive, Milroy, Mifflin County, Pennsylvania; and

WHEREAS, in justified reliance on the terms of the Lease, Kennedy-Smith on or about September 15, 2011 entered into a Sublease Agreement with Subway Real Estate, LLC to operate a Subway® restaurant at the shopping plaza at 15 Commerce Drive, Suite 200/B, Milroy, Mifflin County, Pennsylvania; and

WHEREAS, Kennedy-Smith has been operating the Subway® restaurant at 15 Commerce Drive, Suite 200/B, Milroy, Mifflin County, Pennsylvania since it opened on April 20, 2012; and

WHEREAS, the Lease contains a provision requiring Milroy to provide Subway Real Estate, LLC with exclusivity rights to the sale and service of ready-to-eat food within one mile of the [L]eased [P]remises for property owned or controlled by Milroy; and

WHEREAS, Ajit R. Smith is the sole member of [Milroy] and also the sole member of Milroy Sports Bar, LLC, a Pennsylvania limited liability company doing business as Smitty's Sportsbar & Grill (hereinafter "Smitty's"); and

WHEREAS, on or about August 2, 2012, Smitty's opened a competing restaurant in Suite 500/B at 15 Commerce Drive, Milroy, Mifflin County, Pennsylvania and began selling and serving ready-to-eat-food; and

WHEREAS, there have been several pervasive construction problems affecting and interfering with use and enjoyment of the Leased Premises (including but not limited to plumbing problems, electrical system deficiencies, inadequate parking, lack of parking lot lighting, and an incomplete firewall) that are Milroy's responsibility but have not been corrected by Milroy; and

WHEREAS, Kennedy-Smith initiated a civil lawsuit in Mifflin County Court of Common pleas, docketed at No. CP-44-CV-1171-2012 against Milroy concerning issues related to the Leased Premises; and

WHEREAS, the Mifflin County Court of Common Pleas issued a Preliminary Injunction against Milroy as it related to Smitty's; and

WHEREAS, Kennedy-Smith and Milroy wish to resolve and settle the aforesaid matter docketed at No. CP-44-CV-1171-2012 in accordance with the terms and conditions set forth herein.

Agreement, 9/3/13, at 1–2.

The parties filed a stipulation on September 4, 2013, requesting that the trial court enter a consent order. The stipulation included as an attachment an approved menu for Smitty's. As requested, the trial court entered a consent order, which provided as follows:

[Milroy] shall be prohibited from selling or serving ready-to-eat food, as defined by 7 Pa. Code § 46.3 and in accordance with section thirty-two of the 2011 Lease with specific, limited exception that [Milroy] doing business as "Smitty's" . . . is permitted to sell and serve only those items listed on the attached menu and only for the prices listed on the attached menu and only for hours of operation not to begin prior to 4:00 p.m. on Mondays, Tuesdays, Wednesdays, Thursdays, and Fridays and for hours of operation not to begin prior to 12:00 p.m. on Saturdays and Sundays.

Consent Order, 9/17/13, at ¶ 3.

On March 24, 2016, Kennedy-Smith filed a Petition to Enforce Settlement Agreement, Stipulation and Consent Order ("the Petition"), averring that Smitty's was using an unapproved menu, offering unapproved specials, and operating outside of the agreed-upon hours. Milroy filed an

- 3 -

answer and cross-petition ("the Cross-petition"), averring that Kennedy-Smith breached the Settlement Agreement by failing to act in good faith, pay rent, and meet her responsibility for trash removal.

The trial court conducted a hearing on July 6, 2016, at which Kennedy-Smith; the parties' appointed certifier, Lucas A. Parkes ("Mr. Parkes"); Kennedy-Smith's husband, Ken Smith; and Milroy's general manager, Dip Smith, testified. The trial court filed an order and opinion denying the Petition and granting, in part, the Cross-petition. Order and Opinion, 8/16/16. Although both parties requested attorneys' fees, the trial court declined to award them to either party. Kennedy-Smith appealed the denial of the Petition, and Milroy cross-appealed the denial of attorneys' fees. The parties and the trial court have complied with Pa.R.A.P. 1925.

We begin with Kennedy-Smith's appeal, wherein she presents the following questions for our consideration:

1. Did the trial court err by finding that [Milroy] did not violate Paragraph 1.c of the Settlement Agreement by using an unapproved menu as said finding was not supported by competent evidence given evidence presented by [Kennedy-Smith] that she did not approve the December 17, 2014 Smitty's menu nor the two menus admitted into evidence from March of 2016 and the lack of evidence from [Milroy] that the March menus were approved by [Kennedy-Smith]?

2. Did the trial court err by rewriting [P]aragraph 1.d to add a "no harm no foul" exception to 1.d's general rule prohibiting Smitty's from using promotional discounts and food specials, and by finding that [Milroy] did not violate Paragraph 1.d as said finding was not supported by competent evidence given evidence presented by [Kennedy-Smith] that a discounted food special was publicly advertised by [Milroy] and was only

- 4 -

withdrawn after [Kennedy-Smith] learned of the ad and requested that the promotion be discontinued?

3. Did the trial court err by finding that Paragraph 1.i of the Settlement Agreement has been satisfied and that the rent abatement is no longer in effect as of March 1, 2016, as follows:

   a. By misinterpreting Paragraph 1.i to not require that Lucas A. Parkes of the EADS Group certify to a reasonable degree of engineering certainty that all construction deficiencies at [Kennedy-Smith's] Subway suite as required by any applicable codes and as required by any terms of the lease have been fully remedied;

   b. By finding that Lucas Parkes "certification" satisfied Paragraph 1.i while at the same time acknowledging that Mr. Parkes could not give such a certification because of his credentials;

   c. By effectively relying upon and accepting into evidence over objection a letter from an out-of-court witness (Earl Baer from Commonwealth Code Inspection Services) who was not subject to cross-examination and who simply issued a permit and did not certify to a reasonable degree of engineering certainty that all noted Subway construction deficiencies required by any applicable codes and as required by any terms of the [L]ease have been fully remedied;

   d. By failing to request from the current applicable local code inspection service known as Bureau Veritas a certification that all noted Subway construction deficiencies required by any applicable codes have been fully remedied; and

   e. By refusing to permit [Kennedy-Smith's] husband Ken A. Smith to testify fully as a fact witness regarding the extent of the longstanding construction deficiencies at the Subway suite that Mr. Parkes ignored in his two letters dated February 18, 2016?

4. Did the trial court err by interpreting the parties' Lease as amended to place financial responsibility on [Kennedy-Smith] for the collection and removal of all trash deposited in her leased premises, as follows:

    a. By misinterpreting Section Four of the Lease which specifically enumerates trash removal as an "operating cost" and provides that [Kennedy-Smith] shall not pay operating costs and that [Milroy] shall pay all operating costs; and

    b. By misinterpreting Section Six of the Lease which specifically lists the utilities that [Kennedy-Smith] must pay for and does not specifically reference trash removal as a tenant-paid utility service?

Kennedy-Smith's Brief at 3–5.

In beginning our analysis, we note:

Our standard of review of a trial court's grant or denial of a motion to enforce a settlement agreement is plenary, as the challenge is to the trial court's conclusion of law. We are free to draw our own inferences and reach our own conclusions from the facts as found by the trial court. However, we are only bound by the trial court's findings of fact which are supported by competent evidence.

*Hannington v. Trustees of Univ. of Pennsylvania*, 809 A.2d 406, 408

(Pa. Super. 2002) (citations and quotation marks omitted).

Settlement agreements are governed by contract law principles.

*Lesko v. Frankford Hospital-Bucks County*, 15 A.3d 337, 342 (Pa. 2011)

(citation omitted).

When a written contract is clear and unequivocal, its meaning must be determined by its contents alone. It speaks for itself and a meaning cannot be given to it other than that expressed. Where the intention of the parties is clear, there is no need to resort to extrinsic aids or evidence.

Hence, where language is clear and unambiguous, the focus of interpretation is upon the terms of the agreement as manifestly expressed, rather than as, perhaps, silently intended.

**Steuart v. McChesney**, 498 Pa. 45, 444 A.2d 659, 661 (1982) (citation and internal quotations omitted) (emphasis in original). The meaning of an unambiguous contract presents a question of law for which our review is *de novo*. **Seven Springs Farm, Inc. v. Croker**, 569 Pa. 202, 801 A.2d 1212, 1215 n. 1 (2002).

"The fundamental rule in contract interpretation is to ascertain the intent of the contracting parties. In cases of a written contract, the intent of the parties is the writing itself." **Insurance Adjustment Bureau**[*, Inc. v. Allstate Ins. Co.*], [905 A.2d 462,] 468 [Pa. 2006] (citations omitted). "In determining the intent of the contracting parties, all provisions in the agreement will be construed together and each will be given effect.... This Court will not interpret one provision of a contract in a manner which results in another portion being annulled." **LJL Transportation, Inc. v. Pilot Air Freight Corporation**, 599 Pa. 546, 962 A.2d 639, 647–48 (2009) (citations omitted).

**Lesko**, 15 A.3d at 342 (footnote omitted).

Kennedy-Smith first challenges the denial of the Petition based on the trial court's finding that Milroy did not use an unapproved menu. This issue concerns the following provision of the Settlement Agreement:

c. Smitty's menu items will be subject to approval from Kennedy[-]Smith, who has absolute discretion and right to veto a proposed menu for any reason or no reason. Smitty's will sell and serve only those items listed and at those prices stated on Exhibit B attached and incorporated herein by reference to this Agreement. If Smitty's wishes to add any other menu items or change prices of current menu items, those changes must be approved by Kennedy-Smith in writing.

Settlement Agreement, 9/3/13, at ¶ 1.c. Kennedy-Smith alleges two instances of Milroy using menus for Smitty's that she did not approve after

execution of the Settlement Agreement: The first occurred in December of 2014, when Milroy sought a change of beverage vendor for Smitty's; the second occurred in March of 2016, when Milroy added new items to Smitty's menu and raised its prices. Kennedy-Smith argues that, because Milroy did not propose these changes to her and she did not approve them, the trial court erred in denying the Petition. Kennedy-Smith's Brief at 25.

The trial court disposed of Kennedy-Smith's first issue as follows:

On December 17, 2014, [Milroy] requested another revision to the menu. This revision included a change from Coca-Cola products to Pepsi products,[1] allowed side dishes to be priced separately and added a $4.99 wing feature. [Kennedy-Smith] approved this menu, but claims she was unaware of the changes to the side dishes and the wing feature, as [Milroy] did not specifically reference those changes. Thus, [Kennedy-Smith] claims this menu is unapproved and in violation of the Settlement Agreement.

* * *

[Kennedy-Smith] requests the [c]ourt find [Milroy] has violated paragraph 1(c) of the Settlement Agreement by using an unapproved menu. The [c]ourt declines to find [Milroy] has violated this provision. [Kennedy-Smith] had an opportunity to inspect the December 17, 2014 menu, prior to its issuance, and [Kennedy-Smith] approved of its content. Therefore, [Kennedy-Smith's] request is denied.

Trial Court Order, 8/16/16, at 2–3.

_____

[1] Regarding the proposed December 2014 menu, Kennedy-Smith acknowledged that Milroy requested—and she approved—a change whereby Smitty's switched from selling Coke® products to Pepsi® products. N.T., 7/6/16, at 23.

Kennedy-Smith testified on direct examination as to Milroy's request in December of 2014:

Q. And in December of 2014 did [Milroy] request that you change the menu so they could change from Coke to Pepsi products?

A. Yes.

Q. And did you agree with that change?

A. Yes.

Q. At the time that change was made, were there other things in the . . . revised menu that perhaps weren't made clear to you as far as what was being requested?

A. When the request was made to switch from Coke to Pepsi products, that was the only request made at that time. I did -- and the prices also be included with those. He then sometime later e-mailed, sent an e-mail that said attached is the, you know, menu, revised menu, with the soft drinks and teas added, and at that time I looked at it and side dishes were priced separately in reverse in the border and the back section with wings, they had added six wings for $4.99.

Q. So these last two items you just referenced, the wings and then the pricing along the border of the side dishes, had not been specifically pointed out to you? That might have been in what was sent, but it wasn't specifically pointed out to you?

A. There was never a request made to me.

* * *

Q. So your position is you did not approve either the wings part or the sides being separately priced on the border?

A. No, I did not.

N.T., 7/6/16, at 23–24.

Additionally, Kennedy-Smith testified on cross-examination, as follows:

> Q.    That Mr. Dip Smith did request, send you a request to approve the new menu, which included wings and sides?
>
> A.    Which new menu are you referring to?
>
> Q.    The one that was referred to in the e-mail exchange of March of this year.
>
> A.    March of this year?
>
> Q.    Yeah.
>
> A.    That actually came from Blue Pande [Smitty's assistant manager[2]].
>
> Q.    I believe there is also an exchange between Dip Smith and yourself.  I'll show you the exhibit in a minute, but, in fact, there was a request and there had been requests from Smitty's to you for menu approval?
>
> A.    Yes.
>
> Q.    Pursuant to the agreement?
>
> A.    Yes.
>
> Q.    And [your counsel] showed you P-9, which was the sample menu and you did receive that, correct?
>
> A.    I did.  That's the one that Blue Pande sent to me.
>
> Q.    And the problem is it did not have prices on it?
>
> A.    There were no prices, and there were additional menu items that I had questions about.

N.T., 7/6/16, at 59–60; Exhibits P-9, P-10.

---

[2]  N.T., 7/6/16, at 146.

Contrarily, Dip Smith, Milroy's General Property Manager, suggested in a March 30, 2016 e-mail that Kennedy-Smith had approved the menu proposed on March 6, 2016, that included changes in a menu from December of 2014:

Debra,

As I said before, the menu you approved with the Pepsi changes had the sides listed individually. You may have overlooked it, but you still approved what was there because I know better than to just do as I please instead of abiding by our agreement. The content is the same as what I sent you via email, which you showed no objection to.

As per our agreement, we must get your approval for changes as we asked for below so that is why. Our intention is never to breach the contract because we are well aware of the guidelines.

N.T., 7/6/16, at Exhibit D-4. On direct examination, Dip Smith explained why he wrote the March 30, 2016 e-mail:

A. I wrote that because all of the sudden she kind of found out that we had sides listed there, which were on the top of the border of the menu. I believe it's in one of the exhibits. The sides were listed at the top of the menu, and it wasn't called out. She was unaware of it.

Q. So you moved the sides from the top of the menu to the side of the menu?

A. No. The sides weren't listed at all. The side salads came with the dinners, and all it was was like you could get a basket of French Fries or curly fries, things that we were already serving, but as a side separately.

Q. And that was being priced separately?

A.    Priced separately, yes.  And that was sent in the e-mail, and there was a lot of communication just by phone or text message, and that's how it came about. . . .

N.T., 7/6/16, at 147–148.  However, Dip Smith acknowledged that, as of the July 6, 2016 hearing, Kennedy-Smith had not approved "the proposed menu with the prices."  *Id.* at 153–154.

Based on the testimonial and documentary evidence, we conclude the record does not support the trial court's finding that Kennedy-Smith approved the December 17, 2014 menu.  Trial Court Order, 8/16/16, at 3. The plain language of the Settlement Agreement requires approval in writing.  Settlement Agreement, 9/3/13, at ¶ 1.c.  Milroy sent a request in December of 2014 to change the beverage vendor from Coke® to Pepsi®, which request Kennedy-Smith admittedly approved.  Although Milroy may have sent a revised menu to Kennedy-Smith in December of 2014, it did not request approval of any other menu changes at that time.  Thereafter, Kennedy-Smith received a menu in March of 2016 that included side dishes and $4.99 wings.  Although the record is unclear as to whether those items were also in the December 17, 2014 menu, both Kennedy-Smith and Dip Smith testified that the menu discussed in the March 2016 emails was not approved.[3]    N.T., 7/6/16, at 23–24, 153–154.  Moreover, even if the

_____

[3] We note the trial court made no findings or conclusions regarding whether Kennedy-Smith approved the menu discussed in the March 2016 emails. Nevertheless, assuming the December 17, 2014 and March 2016 menus
*(Footnote Continued Next Page)*

December 17, 2014 menu included side dishes and $4.99 wings and Kennedy-Smith "showed no objection"[4] to that menu, showing no objection is not the equivalent of providing written approval of the menu. Indeed, the record contains no evidence that Kennedy-Smith approved, in writing, any menu that included side dishes and $4.99 wings. Thus, the trial court erred in ruling that Milroy did not violate the Settlement Agreement by using an unapproved menu. Accordingly, we vacate that portion of the trial court's order addressing Milroy's use of an unapproved menu and remand for a determination of what relief, if any, is due to Kennedy-Smith as a result of Milroy's violation of paragraph 1.c.

Next, Kennedy-Smith challenges the denial of the Petition based on the trial court's finding that Milroy did not use promotional discounts and food specials. This issue concerns the following provision in the Settlement Agreement:

> d. Smitty's will not use any promotional discounts such as "all you can eat" (AYCE), "buy one, get one" (BOGO), free with purchase of beverage, or any other discounted food special.

Settlement Agreement, 9/3/13, at ¶ 1.d. Kennedy-Smith submits that Milroy "violated [P]aragraph 1.d by issuing a Facebook post advertising free

_(Footnote Continued)_ ─────────

were the same, the trial court's conclusion that Kennedy-Smith approved the former would suggest a similar conclusion that she approved the latter.

[4] N.T., 7/6/16, at Exhibit D-4 (March 30, 2016 Dip Smith email).

one-half sized fried appetizers during halftime of the Super Bowl in 2014."
Kennedy-Smith's Brief at 28 (citing Exhibit P-11). According to Kennedy-Smith, "[d]espite this evidence that [Milroy] publicly advertised a discounted food special," the trial court took a "no harm no foul" approach to the violation. *Id.* Kennedy-Smith requests that we reverse the trial court's order denying her petition to enforce and "remand the matter to the trial court to determine the appropriate sanction for [Milroy's] violation of [P]aragraph 1.d." *Id.* at 29.

After setting forth the language of Paragraph 1.d, the trial court addressed this issue, as follows:

> [Kennedy-Smith] testified that [Milroy] advertised a free one-half sized fried appetizers during halftime of the 2014 Super Bowl on Facebook. [Kennedy-Smith] sent [Milroy] an email noting the violation and [Milroy] immediately withdrew the advertisement and told customers that this special would not be provided. As [Milroy] did not pursue this promotion, but immediately withdrew and rescinded the promotion, the [c]ourt finds no violation of the Settlement Agreement.

Trial Court Opinion, 8/16/16, at 3.

Upon review, we reject Kennedy-Smith's argument that the trial court rewrote and/or misinterpreted Paragraph 1.d in denying the Petition. Kennedy-Smith's expressed complaint is that Milroy "publicly advertised a discounted food special." Kennedy-Smith's Brief at 28. However, the plain language of Paragraph 1.d precludes Milroy from "using" any promotional discounts. Settlement Agreement, 9/3/13, at ¶ 1.d. Kennedy-Smith does not claim—and the record does not indicate—that Milroy did, in fact, provide

- 14 -

its customers with free one-half-sized fried appetizers during halftime of the 2014 Super Bowl. Rather, as Kennedy-Smith admitted, Milroy immediately and publicly rescinded the promotion upon receipt of her email. N.T., 7/6/16, at 61. Accordingly, we find support in the record for the trial court's findings, and we discern no error in its conclusion that Milroy did not violate Paragraph 1.d of the Settlement Agreement.

Kennedy-Smith's third issue concerns the trial court's order directing her to pay rent, which was based on its conclusion that Milroy satisfied the rent abatement provision of the Settlement Agreement. That provision reads as follows:

> i. Milroy agrees that all rent charges shall be abated while construction issues are unresolved. Milroy waives its right to collect any rents from Subway Real Estate, LLC or Kennedy-Smith until the first of the month following Kennedy-Smith's receipt of written certification from Lucas A. Parkes of the EADS Group that all construction deficiencies as required by any applicable codes (such as but not limited to the problems with the plumbing system, electrical system, and firewall) and also as required by any terms of the Lease (such as but not limited to the installation and activation of parking lot lighting) have been fully remedied.

Settlement Agreement, 9/3/13, at ¶ 1.i.

The trial court summarized the background of this issue and disposed of it, as follows:

> In accord with provision 1(i), [Kennedy-Smith] received a letter from Lucas Parkes on February 18, 2016. Lucas Parkes asserted that [Milroy] was in compliance, as concluded by Mr. Baer of Commonwealth Code Inspection Service, Inc. (*hereafter* "Commonwealth Code"). Based upon the language of the letter, [Kennedy-Smith] refused to pay rent at that time. [Kennedy-

- 15 -

Smith] requested that Mr. Parkes certify to a reasonable degree of engineering certainty that all construction deficiencies were corrected. On May 13, 2016, [Kennedy-Smith] received a second letter from Mr. Parkes. Like the first letter, this letter did not certify to a reasonable degree of engineering certainty that all construction deficiencies were remedied, but reasserted compliance based on the conclusions of Commonwealth Code, using the language provided in the Settlement Agreement. Once again, [Kennedy-Smith] refused to pay rent.

* * *

By agreement of Parties, Lucas Parkes' verification would initiate [Milroy's] right to collect rent. On February 18, 2016, Lucas Parkes informed [Kennedy-Smith] that the Leased Premises were in compliance with the applicable building codes and that the parking lot and associated lighting had been installed and activated, as required by the Lease. [Milroy] maintains an occupancy permit and is functioning properly under verification by the Commonwealth Code and Lucas Parkes. Therefore, the [c]ourt finds provision 1(i) has been satisfied. [Kennedy-Smith] shall pay the rent due from March 1, 2016 to present, and continue payments on the first day of each month hereafter. [Milroy's] request for rent is granted.

Trial Court Order, 8/16/16, at 5, 6.

Kennedy-Smith mounts multiple attacks on the trial court's conclusion that Milroy satisfied Paragraph 1.i. Kennedy-Smith's Brief at 31, 35, 36, 42. Kennedy-Smith first argues that the two letters written by Mr. Parkes do not contain "the required certification language."[5] *Id.* at 31. The trial court

_____

[5] The letters read, in relevant part, as follows:

Based upon the letter provided by Commonwealth Code Inspection Services, dated February 17, 2016, it appears that the structure at 15 Commerce Drive is in compliance with the applicable building codes. Additionally, the parking lot and

*(Footnote Continued Next Page)*

responded to this argument succinctly: "Written certification was never defined in Parties' agreement." Trial Court Order, 8/16/16, at 5.

We reiterate, "When the terms of a contract are clear and unambiguous, the intent of the parties is to be ascertained from the document itself." *Lenau v. Co-eXprise, Inc.*, 102 A.3d 423, 429 (Pa. Super. 2014) (quoting *Kripp v. Kripp*, 849 A.2d 1159, 1163 (Pa. 2004)). In the case at hand, we discern no error of law in the trial court's construction of Paragraph 1.i. The plain and unambiguous language of that paragraph provides that Kennedy-Smith was to begin paying rent on the first day of the month "**following Kennedy-Smith's receipt of written certification from Lucas A. Parkes . . . that all construction**

*(Footnote Continued)* ———————————————

> associated lighting has been installed and is activated as required by the tenant's lease.

Lucas Parkes Letter, 2/18/16.

> Based upon the letter provided by Commonwealth Code Inspection Services, dated February 17, 2016:
>
> "All Construction deficiencies as required by the applicable codes (such as but not limited to the problems with the plumbing system, electrical system and firewall) and also as required by any terms of the Lease (such as but not limited to the installation and activation of any parking lot lighting) have been fully remedied."
>
> This letter is effective as of February 18, 2016.

Lucas Parkes Letter, 5/13/16.

- 17 -

**deficiencies as required by any applicable codes . . . and also as required by any terms of the Lease . . . have been fully remedied**." Settlement Agreement, 9/3/13, at ¶ 1.i (emphases supplied). Contrary to Kennedy-Smith's assertion, the Settlement Agreement does not specify any standard of review or language Mr. Parkes was to provide in his written certification. Moreover, the lack of a definition of the term "certification" does not create an ambiguity. Rather, we give that word its ordinary meaning. *Lenau*, 102 A.3d at 429. According to Merriam-Webster, to certify means "1: to attest authoritatively... 2: to inform with certainty." www.merriam-wester.com/dictionary/certify at 1, 2 (September 20, 2017).

Here, Mr. Parkes sent two letters. The first, dated February 18, 2016, was equivocal: "**[I]t appears** that the structure at 15 Commerce Drive is in compliance with the applicable building codes." N.T., 7/6/16, at Exhibit 18 (emphases supplied). However, the second letter, effective as of February 18, 2016, informed Kennedy-Smith with certainty: "**[A]ll construction deficiencies** as required by the applicable codes . . . and also as required by any terms of the Lease . . . **have been fully remedied**." *Id.* at Exhibit 20 (emphases supplied). To the extent Kennedy-Smith required "a certification from Lucas A. Parkes to a reasonable degree of engineering certainty," Kennedy-Smith's Brief at 32, the parties did not include that wording and standard in Paragraph 1.i. Therefore, we discern no error in

the trial court's conclusions that Milroy satisfied Paragraph 1.i and that Kennedy-Smith was required to pay rent as of March 1, 2016.

Kennedy-Smith next argues, "The trial court . . . erred in . . . concluding that Mr. Parkes 'was not qualified to determine whether the building satisfied all applicable codes' while at the same time finding that [P]aragraph 1.i has been satisfied." Kennedy-Smith's Brief at 35. According to Kennedy-Smith, if Mr. Parkes was not qualified to provide the requisite certification, then the trial court should not have concluded that the certification was provided. *Id.* at 36.

We observe that Kennedy-Smith provides minimal argument and no authority to support this averment of trial court error. Kennedy-Smith's Brief at 35–36. Therefore, it is waived. Pa.R.A.P. 2119(a); *see In re W.H.*, 25 A.3d 330, 339 (Pa. Super. 2011) ("[W]here an appellate brief fails to provide any discussion of a claim with citation to relevant authority or fails to develop the issue in any other meaningful fashion capable of review, that claim is waived."). However, even if this argument were not waived, we would conclude that no relief is due.

The trial court observed:

> [Kennedy-Smith] demands a certification that Mr. Parkes cannot legally give. Mr. Parkes testified that he was not qualified to determine whether the building satisfied all applicable codes. Mr. Parkes emphasized that he was not part of the negotiations between Parties and that he did not volunteer to be part of [the] certification. Rather, Mr. Parkes was picked by Parties to be a neutral third party. Mr. Parkes feels as though he complied with Parties' request.

Trial Court Order, 8/16/16, at 6. Indeed, the Settlement Agreement contains no requirements or restrictions regarding the qualifications of Mr. Parkes. Because Kennedy-Smith "contributed to the drafting of [the] Agreement," Settlement Agreement, 9/3/13, at ¶ 10, and participated in the selection of Mr. Parkes as the neutral, third party who would provide an undefined certification, N.T., 7/6/16, at 41, 64, we decline to entertain her complaint that he was not qualified to her satisfaction.

Kennedy-Smith's third challenge to the ruling that Milroy satisfied Paragraph 1.i concerns the trial court's admission of a letter by Earl Baer ("Mr. Baer"), on which Mr. Parkes relied and to which Kennedy-Smith objected ("Baer Letter").[6] Kennedy-Smith's Brief at 36 (citing Exhibit D-6(B)). According to Kennedy-Smith, the Baer Letter is inadmissible hearsay because it "was presented . . . to prove the truth of the matter asserted— that the outstanding code violations had been corrected," *id.* at 37, and "Mr. Baer was not present to be cross-examined at the July 6, 2016 hearing." *Id.* at 36. Kennedy-Smith also claims that no exceptions to the admission of hearsay "apply to the facts of this case." *Id.* at 37. Alternatively, Kennedy-Smith argues that, even if the Baer Letter were admissible, it does not satisfy the requirements of paragraph 1.i because it was not written by Mr.

_____

[6] Mr. Baer worked for Commonwealth Code Inspections Services, Inc., the local code inspection service. N.T., 7/6/16, at 100, Exhibit D-6(B).

Parkes and it does not certify to a reasonable degree of engineering certainty. *Id.* at 41.

Milroy counters that the Baer Letter was not offered for the truth of its contents, but to serve as the foundation for Mr. Parkes' certification, "to show why [Mr.] Parkes provided his certification." Milroy's Brief at 18. Unfortunately, the trial court did not address this argument in its Pa.R.A.P. 1925(a) opinion. However, at the hearing, counsel for Kennedy-Smith suggested, and the trial court agreed, that admission of the Baer Letter went "to the weight of Mr. Parkes' testimony." N.T., 7/6/16, at 134. The trial court admitted the Baer Letter, stating, "I think the questioning will indicate and the record will say that is what [Mr. Parkes] relied upon in issuing the letter per [paragraph 1.i]. Whether that was enough in my eyes to meet the standard that is set forth in [paragraph 1.i] that's for me to decide." *Id.*

Our standard of review of evidentiary rulings is narrow:

When we review a trial court's ruling on admission of evidence, we must acknowledge that decisions on admissibility are within the sound discretion of the trial court and will not be overturned absent an abuse of discretion or misapplication of law. In addition, for a ruling on evidence to constitute reversible error, it must have been harmful or prejudicial to the complaining party. A party suffers prejudice when the trial court's error could have affected the verdict.

*Int'l Diamond Importers, Ltd. v. Singularity Clark, L.P.*, 40 A.3d 1261, 1267 (Pa. Super. 2012) (quoting *Reott v. Asia Trend, Inc.*, 7 A.3d 830, 839 (Pa. Super. 2010) (citations and internal quotation marks omitted)).

The trial court treated the Baer Letter as foundation evidence, not hearsay, and determined that Mr. Parkes' reliance on it was "enough in [its] eyes to meet the standard that is set forth in paragraph 1.i." N.T., 7/6/16, at 134. Upon review of the record, we discern no basis for upsetting the trial court's ruling. Pursuant to the plain language of the Settlement Agreement, Mr. Parkes was to inform Kennedy-Smith with certainty that the construction deficiencies had been remedied, which he did. As discussed above, the Settlement Agreement contains no requirements regarding the qualifications of Mr. Parkes and the language or standard of his certification; nor does the Settlement Agreement contain any specifics regarding the process by which Mr. Parkes arrived at his certification. Nothing in the Settlement Agreement required Mr. Parkes to conduct an independent review of the construction issues or precluded him from relying on the opinion of another, *e.g.*, Mr. Baer, regarding the status of the construction issues.

Additionally, we find no indication in the record that Kennedy-Smith suffered prejudice as a result of the challenged evidentiary ruling. We reiterate that Kennedy-Smith contributed to the drafting of the Settlement Agreement and participated in the selection of Mr. Parkes. If Kennedy-Smith required a more substantive certification by a more qualified third party and a more rigorous certification process, then she should have written those terms into the Settlement Agreement. Moreover, Kennedy-Smith was aware

of Mr. Baer's role through Mr. Parkes' letters and could have discredited his opinions through discovery or by calling him as a witness. Because she chose not to do so, her complaints that Mr. Parkes relied on Mr. Baer's opinion and that the trial court gave weight to that reliance ring hollow. Therefore, we discern no abuse of the trial court's discretion or misapplication of the law in admitting the Baer Letter.

Kennedy-Smith's fourth challenge to the rent-abatement ruling is that the trial court erred in failing to request an inspection of her Subway property by Bureau Veritas, the local code inspection service and successor to Commonwealth Code. Kennedy-Smith's Brief at 42. We dispose of this argument in short order. Our review of the record confirms that, at the hearing, the trial court suggested it might be helpful to have the current code inspection service visit the premises. N.T., 7/6/16, at 118–119, 132–133. However, the trial court's failure to pursue a visit by Bureau Veritas was not legal error because the trial court was under no obligation to order an updated inspection. This assignment of error is meritless.

Kennedy-Smith's final complaint regarding Paragraph 1.i is that the trial court refused to let her husband, Ken Smith, testify as a fact witness to the construction deficiencies and about his concerns regarding Mr. Baer and Commonwealth Code. Kennedy-Smith's Brief at 43, 45. According to Kennedy-Smith, Ken Smith had superior knowledge of the problems at her Subway property and should have been permitted to testify because Mr.

Parkes was not equipped to answer factual questions about the construction deficiencies and Mr. Baer was not present for examination. *Id.* at 46.

We repeat, "[D]ecisions on admissibility are within the sound discretion of the trial court and will not be overturned absent an abuse of discretion or misapplication of law." *Int'l Diamond Importers*, 40 A.3d at 1267. "The basic requisite for the admission of any evidence is that it be both competent and relevant. Evidence is competent if it is material to the issues to be determined at trial, and relevant if it tends to prove or disprove a material fact in issue." *Sutch v. Roxborough Mem'l Hosp.*, 142 A.3d 38, 70–71 (Pa. Super. 2016), *appeal denied*, 163 A.3d 399 (Pa. 2016) (quoting *Moroney v. General Motors Corp.*, 850 A.2d 629, 632 (Pa. Super. 2004)).

Evidence is relevant if:

(a) it has any tendency to make a fact more or less probable than it would be without the evidence; and

(b) the fact is of consequence in determining the action. "Relevant evidence" means evidence having any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence.

Pa.R.E. 401; *see also* Pa.R.E. 402 ("All relevant evidence is admissible, except as otherwise provided by law. Evidence that is not relevant is not admissible.").

Again, the trial court did not address this argument in its Pa.R.A.P. 1925(a) opinion. Nevertheless, our review of the record reveals that, in the

Cross-petition, Milroy requested rent based on Mr. Parkes' written certification that all construction deficiencies had been resolved. Cross-Petition, 4/15/16, at ¶¶ 49–51. In response, Kennedy-Smith claimed that Mr. Parkes' letter "does not comprise a certification that all construction deficiencies as required by any applicable codes and by any terms of the lease have been fully remedied." Answer to Cross-Petition, 5/9/16, at ¶¶ 49–51. In support of her defense that she did not owe rent, Kennedy-Smith testified that certain construction deficiencies were not remedied, *e.g.*, problematic toilet-flushing, insufficient water pressure, inadequate electrical service, inefficient positioning of the electrical box, hanging insulation, and an uninsulated water line. N.T., 7/6/16, at 39–41. In further support, Kennedy-Smith called Ken Smith to testify about the construction deficiencies and code requirements. **Id.** at 109.

According to Kennedy-Smith's offers of proof, Ken Smith was prepared "to discuss solely issues that kind of give background on the Lucas Parkes' certification," to talk about some conditions that existed at Suite 200," and to provide "a little factual background that might address" the "ambiguous" language of paragraph 1.i. N.T., 7/6/16, at 79, 107. When Milroy objected to Ken Smith's testimony about construction deficiencies, the trial court permitted Ken Smith "to testify specifically to his understanding of the Settlement Agreement," noting that he was not a code inspector, professional contractor, or engineer. **Id.** at 108–111. As Ken Smith began

to express his opinions about what construction problems existed and why, the trial court and both counsel engaged in a lengthy discussion, after which Kennedy-Smith moved for the admission of her exhibits, including photographs of alleged construction deficiencies, and Milroy began its case. *Id.* at 113–117, 118–134, 135–136, Exhibits P21–P25.

Based on this record, we conclude that Ken Smith's proffered testimony regarding construction deficiencies and code requirements was neither competent nor relevant. A determination of whether Milroy was entitled to rent required evidence that Mr. Parkes provided a certification that the construction deficiencies were remedied. Settlement Agreement, 9/3/13, at ¶ 1.i. Ken Smith was a professional pilot, not a contractor, a code inspector, or an engineer. N.T., 7/6/16, at 108. Therefore, Ken Smith's testimony about construction deficiencies and code requirements was not competent because it was not material to a determination of whether Milroy was entitled to rent based on Mr. Parkes' letter. ***Moroney***, 850 A.2d at 632. Similarly, Ken Smith's testimony was not relevant because it would not make Milroy's entitlement to rent based on Mr. Parkes' letter more or less probable. Pa.R.E. 401. Accordingly, we discern no abuse of the trial court's discretion or misapplication of the law in precluding Ken Smith's proffered testimony.

In her fourth and final issue, Kennedy-Smith challenges the trial court's ruling that she was responsible to pay for the collection and removal

of trash originating at her Subway restaurant. Kennedy-Smith's Brief at 47 (citing Cross-Petition to Enforce, 4/15/16, at 11). Kennedy-Smith argues that Sections Four and Six of the First Amendment to Lease ("Amended Lease") "place the responsibility for trash removal upon [Milroy,] the Defendant Landlord." *Id.* According to Kennedy-Smith, "trash removal" is included in the list of operating costs for which Milory was responsible under Section Four, but it is not included in the list of utilities for which she was responsible under Section Six. *Id.* at 48.

The trial court disposed of this issue with the following analysis:

Under the terms of the Parties' Lease and Amendment thereto, [Milroy] is to pay for the Operating Costs of business. Operating Costs are defined as, ". . . all sums paid or incurred by Landlord for the maintenance, and operation of the Building, including both costs allocable to the buildings and to all common areas." These costs included, without limitation,

". . . the costs and expenses attributable to [the following:] repair and maintenance of the buildings and improvements [constituting] the Building, resurfacing, repainting, and restriping parking areas; cleaning, sweeping, trash removal, and other janitorial services; policing and security services; the purchase, construction, and maintenance of refuse receptacles; installing and maintaining plantings and landscaping; directional signs and other markers, car stops, and the like; the costs of power, lighting and any other utilities furnished to the common areas; premiums on fire, public liability, and property damage insurance; real property taxes levied or assessed against the Building or any portion thereof."

[Kennedy-Smith] is responsible for all utilities furnished to her leased premises during the Term of the Lease, ". . . including water, electricity, gas, sewer, and telephone service."

Trash procured by [Kennedy-Smith's] restaurant is not produced due to [Milroy's] ownership of the building and premises, but rather due to [Kennedy-Smith's] operation of her business in the leased premises. Accordingly, [Kennedy-Smith] is responsible and shall pay for the collection and removal of all trash deposited in her leased premises.

Trial Court Order, 8/16/16, at 6–7.

We repeat, "In determining the intent of the contracting parties, all provisions in the agreement will be construed together and each will be given effect. Thus, we will not interpret one provision of a contract in a manner which results in another portion being annulled." *Lesko*, 15 A.3d at 342 (quoting *LJL Transportation, Inc.*, 962 A.2d at 647–648) (internal citation omitted).

Upon review, we disagree with the trial court's legal conclusion that Kennedy-Smith was required to contract individually for trash removal. Absent any other consideration, Section Four of the Amended Lease clearly includes "trash removal" in the list of Milroy's obligations. Settlement Agreement, 9/3/13, at Exhibit A (Amended Lease, 9/3/13, at ¶ II). Section Six identifies those utilities and services that Kennedy-Smith was required to contract for independently: water, electricity, gas, sewer, and telephone. Trash removal is not included in that list. *Id.* at ¶ III.

Additionally, the language of Section Four provides that "Operating Costs" include, "without limitation, . . . the costs and expenses attributable to . . . cleaning, sweeping, trash removal, and other janitorial services; . . . the purchase, construction, and maintenance of refuse receptacles[.]"

Settlement Agreement, 9/3/13, at Exhibit A (Amended Lease, 9/3/13, at ¶¶ II, III). Clearly, Milroy's maintenance and operation of the Building, the buildings, and the common areas include removing trash placed in its trash cans and dumpsters. Section Four does not limit the source of the trash, and we discern no language prohibiting Kennedy-Smith from using Milroy's refuse receptacles for Subway's trash. Common sense dictates that, as the tenant, Kennedy-Smith would collect Subway's daily trash and dispose of it in trash receptacles supplied by the landlord, which she does. N.T., 7/6/16, at 72.

Moreover, Section Four of the Original Lease provides that Kennedy-Smith was obligated to pay each month, "as additional rent," a "proportionate share of [Milroy's] estimated Total Operating Costs." Original Lease, 6/6/11, at Section Four. As discussed above, Milroy's Operating Costs include "sums paid or incurred by Milroy" for trash removal. Settlement Agreement, 9/3/13, at Exhibit A (Amended Lease, 9/3/13, at ¶ II). Thus, Kennedy-Smith was, in fact, paying for trash removal. Accordingly, we vacate that portion of the trial court's order requiring Kennedy-Smith to contract independently for trash removal.

We turn now to Milroy's appeal of the order denying its request for attorneys' fees under Paragraph 11 of the Settlement Agreement. Paragraph 11 reads, in relevant part, as follows: "In an action to enforce the terms of this Agreement, the prevailing party shall be entitled to the

recovery of its reasonable attorneys' fees and costs." Settlement Agreement, 9/3/13, at ¶ 11. According to Milroy, it was the prevailing party on the Petition and the substantially prevailing party on the Cross-petition and, as such, entitled to attorneys' fees. Milroy's Brief at 24.

We review an order awarding attorneys' fees under an abuse-of-discretion standard. *True Railroad Associates, L.P. v. Ames True Temper, Inc.*, 152 A.3d 324, 343 (Pa. Super. 2016) (citation omitted). In denying attorneys' fees and costs, the trial court opined as follows:

> Under Paragraph 11 of the Settlement Agreement, Parties agreed that "in an action to enforce the terms of this Agreement, the prevailing party shall be entitled to the recovery of its reasonable attorneys' fees and costs." Both Parties have requested attorney's fees in this matter. However, as both Parties [sic] Petitions are denied, in part, the [c]ourt finds attorney's fees are not proper in this case.

Trial Court Order, 8/16/16, at 7.

Pennsylvania subscribes to the American Rule, by which a party to litigation is responsible for the payment of its own attorneys' fees and costs "unless there is express statutory authorization, a clear agreement of the parties or some other established exception." *Mosaica Academy Charter School v. Com. Dept. of Educ.*, 813 A.2d 813, 822 (Pa. 2002). Although the Settlement Agreement includes a fee-shifting provision, Paragraph 11, it does not define "prevailing party." We have explained that:

> [a] "prevailing party" is commonly defined as "a party in whose favor a judgment is rendered, regardless of the amount of damages awarded." While this definition encompasses those situations were a party receives less relief than was sought or

- 30 -

even nominal relief, its application is still limited to those circumstances where the fact finder declares a winner and the court enters judgment in that party's favor.

***Zavatchen v. RHF Holdings, Inc.***, 907 A.2d 607, 610 (Pa. Super. 2006) (quoting ***Profit Wize Mktg. v. Wiest***, 812 A.2d 1270 (Pa. Super. 2002)).

Applying the above principles, we conclude that the trial court did not abuse its discretion when it determined that Milroy was not entitled to attorneys' fees. With regard to Kennedy-Smith's claims that Milroy violated various provisions of the Settlement Agreement, the trial court found in favor of Milroy, but it affirmed Kennedy-Smith's "absolute discretion" argument regarding menu changes. Petition, 3/24/16, at ¶¶ 21–30; Trial Court Order, 8/16/16, at 2. With regard to the cross-petition, Milroy prevailed on its rent abatement claim but again lost on its duty-of-good-faith claim. Cross-Petition, 4/15/16, at ¶¶ 46–51; Trial Court Order, 8/16/16, at 2. In neither instance did the trial court declare Milroy a winner and enter judgment in its favor. ***Zavatchen***, 907 A.2d at 610. Thus, we discern no basis to disturb the denial of Milroy's request for attorneys' fees and costs.

In sum, Kennedy-Smith's unapproved-menu and trash-removal arguments warrant relief. Accordingly, we vacate those portions of the trial court's order and remand for further proceedings consistent with this Memorandum. We affirm the trial court's order in all other respects.

Order affirmed in part, vacated in part, and case remanded. Jurisdiction relinquished.

Judgment Entered.

Joseph D. Seletyn, Esq.
Prothonotary

Date: <u>10/12/2017</u>